**COMMERCIAL TELEGRAPHERS' UNION, A. F. L., v. WESTERN UNION TELE-GRAPH CO., Inc.., et al. (AMERICAN COMMUNICATIONS ASS'N, C. I. O., Intervener).**

Civil Action No. 21834.

District Court of the United States for the District of Columbia.

Dec. 29, 1943.

Hugh C. McKenny, William J. Howder, and Charles J. Brandt, all of Washington, D. C., for plaintiff.

Ralph H. Kimball, of New York City, for defendant.

Samuel Levine, of Levine & Schlesinger, of Washington, D. C., and Victor Rabino-witz, of firm of Boudin, Cohn & Glickstein, of New York City, for intervener.

Charles R. Denny, Jr., Gen. Counsel, Harry M. Plotkin, and Max Goldman, all of Washington, D. C., for Federal Communications Commission, amicus curiae.

MORRIS, Justice.

This action was brought by the plaintiff, The Commercial Telegraphers' Union, an affiliate of the American Federation of Labor, against the defendant, Western Union Telegraph Company, hereafter referred to as Western Union, for damages for breach of contract and temporary and permanent injunctive relief against a continuing breach thereof. Upon motion, the American Communications Association, an affiliate of the Congress of Industrial Organizations, was allowed to intervene and file answer to the complaint. By leave of Court, the Federal Communications Commission appeared and filed a brief as amicus curiae. The case is before the Court on a motion by the plaintiff for temporary injunction, to the granting of which the defendant, the intervenor, and the Federal Communications Commission are opposed.

The facts, as they appear by the pleadings and in the hearing, in so far as they relate to the immediate issue, are these: The National Labor Relations Board, in accordance with legislative authority,[1] determined the units "appropriate for the purpose of collective bargaining" and designated the plaintiff as "the exclusive representative of all employees in such units" of the defendant, Western Union. Subsequently, on January 15, 1942, the plaintiff entered into a contract with the defendant as such exclusive representative for "the employees of its Washington, D. C., office, all departments, in respect to rates of pay, wages, hours of employment, and other conditions of employment," excepting certain employees to which the contract specifically did not apply. The plaintiff, on or about the same time, entered into like contracts with the defendant respecting numerous other units throughout the United States. All of such contracts were to continue in force from year to year until terminated by either party upon sixty days' notice.

The National Labor Relations Board likewise designated the intervenor as the exclusive bargaining representative for the employees of the Postal Telegraph-Cable Company, hereafter referred to as Postal, with the exception of supervisory employees of said company and certain employees employed in the States of Washington, Oregon and Idaho, the units appropriate for collective bargaining not being on the local basis determined with respect to the Western Union. Subsequently, the intervenor entered into a contract with the Postal as "the exclusive representative for collective bargaining in all matters pertaining to rates of pay, wages, hours of employment, and other conditions of employment for all employees of the company, including wire chiefs and traffic chiefs, who were eligible to vote in the election held pursuant to the Direction of Election, dated November 22, 1938, as amended, issued by the National Labor Relations Board, except employees who, because of their positions, shall be deemed ineligible for membership by the Union." The record does not disclose the date of the original agreement. The agreement filed in this cause was executed June 14, 1943, effective as of October 1, 1942. It is understood, from statement of counsel at the hearing, that such agreement is not substantially different from those in force since the designation of the intervenor, above referred to, in February 1939.

By Act of Congress, approved March 6, 1943, the Communications Act of 1934 was amended by adding Section 222.[2] This legislation made it lawful, upon application to and approval by the Federal Communications Commission, for any two or more domestic telegraph carriers to effect a consolidation or merger. It is provided that, upon application of interested carriers, the Commission shall order a public hearing to be held, notice of which shall be given to numerous designated public officials, and to "representatives of employees where represented by bargaining representatives known to the Commission." The Commission is authorized, after such hearing, to enter an order approving and authorizing such consolidation and merger, if it is

---

[1] 29 U.S.C.A. § 159.  [2] 47 U.S.C.A. § 222.

92

found that it is authorized by the statute, conforms to all other applicable provisions, and is in the public interest. Whereupon, "any law or laws making consolidations and mergers unlawful shall not apply to the proposed consolidation or merger." Much of the legislation authorizing such consolidation and merger has to do with the protection of the rights of employees of any carrier so consolidated or merged.[3] It.

---

[3] "(f) (1) Each employee of any carrier which is a party to a consolidation or merger pursuant to this section who was employed by such carrier immediately preceding the approval of such consolidation or merger, and whose period of employment began on or before March 1, 1941, shall be employed by the carrier resulting from such consolidation or merger for a period of not less than four years from the date of the approval of such consolidation or merger, and during such period no such employee shall, without his consent, have his compensation reduced or be assigned to work which is inconsistent with his past training and experience in the telegraph industry.

"(2) If any employee of any carrier which is a party to any such consolidation or merger, who was employed by such carrier immediately preceding the approval of such consolidation or merger, and whose period of employment began after March 1, 1941, is discharged as a consequence of such consolidation or merger by the carrier resulting therefrom, within four years from the date of approval of the consolidation or merger, such carrier shall pay such employee at the time he is discharged severance pay in cash equal to the amount of salary or compensation he would have received during the full four-week period immediately preceding such discharge at the rate of compensation or salary payable to him during such period, multiplied by the number of years he has been continuously employed immediately preceding such discharge by one or another of such carriers who were parties to such consolidation or merger, but in no case shall any such employee receive less severance pay than the amount of salary or compensation he would have received at such rate if he were employed during such full four-week period: Provided, however, That such severance pay shall not be required to be paid to any employee who is discharged after the expiration of a period, following the date of approval of the consolidation or merger, equal to the aggregate period during which such employee was in the employ, prior to such date of approval, of one or more of the carriers which are parties to the consolidation or merger.

"(3) For a period of four years after the date of approval of any such consolidation or merger, any employee of any carrier which is a party to such consolidation or merger who was such an employee on such date of approval, and who is discharged as a result of such consolidation or merger, shall have a preferential hiring and employment status for any position for which he is qualified by training and experience over any person who has not theretofore been an employee of any such carrier.

"(4) If any employee is transferred from one community to another, as a result of any such consolidation or merger, the carrier resulting therefrom shall pay, in addition to such employee's regular compensation as an employee of such carrier, the actual traveling expenses of such employee and his family, including the cost of packing, crating, drayage, and transportation of household goods and personal effects.

"(5) In the case of any consolidation or merger pursuant to this section, the consolidated or merged carrier shall accord to every employee or former employee, or representative or beneficiary of an employee or former employee, of any carrier which is a party to such consolidation or merger, the same pension, health, disability, or death insurance benefits, as were provided for prior to the date of approval of the consolidation or merger, under any agreement or plan of any carrier which is a party to the consolidation or merger which covered the greatest number of the employees affected by the consolidation or merger; except that in any case in which, prior to the date of approval of the consolidation or merger, an individual has exercised his right of retirement, or any right to health, disability, or death insurance benefits has accrued, under any agreement or plan of any carrier which is a party to the consolidation or merger, pension, health, disability, or death insurance benefits, as the case may be, shall be accorded in conformity with the agreement or plan under which such individual exercised such right of retirement or under which such right to benefits accrued. For purposes of determining and according the rights and benefits specified in this paragraph, any period spent in the employ of the carrier of which such individual was an employee at the time of the consolidation or merger shall be considered to have been spent in the employ of the con-

is readily apparent that the Congress intended to carry into effect the policy reflected in the following quotations from the Report of the House Committee on Interstate and Foreign Commerce, dealing with this legislation:

solidated or merged carrier. The application for approval of any consolidation or merger under this section shall contain a guaranty by the proposed consolidated carrier that there will be no impairment of any of the rights or benefits specified in this paragraph.

"(6) Any employee who, since August 27, 1940, has left a position, other than a temporary position, in the employ of any carrier which is a party to any such consolidation or merger, for the purpose of entering the military or naval forces of the United States, shall be considered to have been in the employ of such carrier during the time he is a member of such forces, and, upon making an application for employment with the consolidated or merged carrier within forty days from the time he is relieved from service in any of such forces under honorable conditions, such former employee shall be employed by the consolidated or merged carrier and entitled to the benefits to which he would have been entitled if he had been employed by one of such carriers during all of such period of service with such forces; except that this paragraph shall not require the consolidated or merged carrier, in the case of any such individual, to pay compensation, or to accord health, disability, or death insurance benefits, for the period during which he was a member of such forces. If any such former employee is disabled and because of such disability is no longer qualified to perform the duties of his former position but otherwise meets the requirements for employment, he shall be given such avaliable employment at an appropriate rate of compensation as he is able to perform and to which his service credit shall entitle him.

"(7) No employee of any carrier which is a party to any such consolidation or merger shall, without his consent, have his compensation reduced, or (except as provided in paragraph (2) and paragraph (8) of this subsection) be discharged or furloughed during the four-year period after the date of the approval of such consolidation or merger. No such employee shall, without his consent, have his compensation reduced, or be discharged or furloughed, in contemplation of such consolidation and merger, during the six-month period immediately preceding such approval.

"(8) Nothing contained in this subsection shall be construed to prevent the discharge of any employee for insubordination, incompetency, or any other similar cause.

"(9) All employees of any carrier resulting from any such consolidation or merger, with respect to their hours of employment, shall retain the rights provided by any collective bargaining agreement in force and effect upon the date of approval of such consolidation or merger until such agreement is terminated, executed, or superseded. Notwithstanding any other provision of this Act, any agreement not prohibited by law pertaining to the protection of employees may hereafter be entered into by such consolidated or merged carrier and the duly authorized representative or representatives of its employees selected according to existing law.

"(10) For purposes of enforcement or protection of rights, privileges, and immunities granted or guaranteed under this subsection, the employees of any such consolidated or merged carrier shall be entitled to the same remedies as are provided by the National Labor Relations Act in the case of employees covered by that Act; and the National Labor Relations Board and the courts of the United States (including the courts of the District of Columbia) shall have jurisdiction and power to enforce and protect such rights, privileges, and immunities in the same manner as in the case of enforcement of the provisions of the National Labor Relations Act.

"(11) Nothing contained in this subsection shall apply to any employee of any carrier which is a party to any such consolidation or merger whose compensation is at the rate of more than $5,000 per annum.

"(12) Notwithstanding the provisions of paragraphs (1) and (7), the protection afforded therein for the period of four years from the date of approval of the consolidation or merger shall not, in the case of any particular employee, continue for a longer period, following such date of approval, than the aggregate period during which such employee was in the employ, prior to such date of approval, of one or more of the carriers which are parties to the consolidation or merger. As used in paragraphs (1), (2), and (7), the term 'compensation' shall not include compensation attributable to overtime not guaranteed by collective bargaining agreements."

"Provisions are included for the protection of employees who may be affected by any such consolidation or merger.

\* \* \* \* \* \*

"\* \* \* Moreover, the general economic situation of telegraph-industry employees, aggravated by a feeling of insecurity as to their employment in the industry, is not conducive to efficient war time operations, especially when manpower demands from outside the industry are so intense. The need for a sound and stable unified domestic telegraph company is plain."

Pursuant to this legislative sanction, on May 25, 1943, Postal and Western Union filed with the Federal Communications Commission an application for approval of a proposed merger. Among many others to whom notice was given, appearances were filed by representatives of the plaintiff and the intervenor. Hearings were begun on July 7, 1943, and concluded on September 23, 1943, on which date an order was entered approving the merger. This merger was accomplished by issue of two classes of stock, both without par value, one class to be issued in exchange for outstanding Western Union stock, and the other in exchange for outstanding Postal stock. The distribution was upon a basis of the worth of the properties as established by the Commission. By the terms of the consolidation, Western Union would acquire all, or substantially all, of the property rights, privileges and franchises, and other assets of every character whatever of the Postal, and the Western Union would assume the obligations and liabilities of the Postal.

During the course of the hearings, it became evident that a very important consideration, which would affect the Commission's action, was the treatment after the merger of the former Postal employees. The Western Union represented that it would assume, among other obligations of the Postal, the contract of that company with the intervenor, and by a communication to the Chairman of the Federal Communications Commission, dated September 15, 1943, stated: "\* \* \* employees absorbed into the Western Union System from the Postal Telegraph Company will be treated for purposes of position, advancement, discharge, and pension rights as if they had been employees of the Western Union Telegraph Company during the period of their employment by the Postal Telegraph Company, subject, of course, to necessary modification to conform to any seniority rules that may be agreed upon by all interested labor groups."

To this communication, the Chairman of the Commission replied by letter, dated September 20, 1943, stating in part:

"You state that full recognition in the merged company will be given to the records of service of employees, irrespective of whether they were formerly Postal Telegraph or Western Union employees. This recognition is to be applied to questions of position, advancement, and all other conditions of employment affected by seniority.

"The Commission is convinced that fulfillment by Western Union of this commitment is essential to the successful merger of the two labor forces. Any other policy would not only be inequitable but might precipitate a wholesale exodus of employees from an industry already suffering from a critical manpower shortage."

In the report of the Commission, accompanying the order approving the merger, it is stated:

"One of the most acute problems in the telegraph industry today is the maintenance of an adequate and stable labor force. Many of the major ills of the industry are directly attributable to shortage of skilled telegraph workers. Inadequacies in the labor force have been responsible for excessive overtime, increasing absenteeism, and decreased efficiency and productivity. Labor turnover has been an especially acute problem in the Postal organization and the company's financial insecurity has been reflected in attitudes of insecurity on the part of its employees, with resultant adverse effects on service. Merger will furnish opportunities for remedying this situation. Elimination of duplicate operations and consolidation of the personnel of the two companies will make available additional employees to the Western Union to relieve present shortages, with consequent betterment of the working conditions of the labor force as a whole, possible curtailment of present turnover trends, and a possible general increase in efficiency and productivity. In addition, the taking over of Postal workers by the merged company with its greater resources, may be expected to furnish to the Postal labor force better prospects for continuous employ-

ment than such force now has. Further benefit to the Postal workers is provided by Western Union's commitment to raise the wage level of the Postal force to the generally higher wage level of Western Union.

"The attainment of the foregoing benefits requires that appropriate measures be taken to insure against an exodus of personnel resulting from a failure to provide against dislocations resulting from the merger. We believe that the specific commitments made by Western Union on this subject will provide safeguards against such dislocation. Western Union, in furtherance of a pledge to utilize the available manpower pool, intends to follow full the general principle that there shall be no discrimination after the merger as between former Western Union and Postal employees. Specifically, Western Union has undertaken to place Postal employees in positions in the merged company comparable to those formerly held by them. * * * Western Union officials have stated that they will honor the union contracts of both companies in effect on the date of the approval of merger. * * *

"In dealing with the problem of seniority, Western Union has committed itself to the policy of merging the seniority of the employees of the two companies so that full recognition shall be given to the records of service of employees irrespective of their former company of employment. This recognition is to be applied to questions of position, advancement, and all other conditions of employment affected by seniority. The Commission believes that this is the only possible policy consistent with the public interest, and that any other policy would not only be inequitable but would have disastrous effects on the already critical manpower problem. In addition to the foregoing, Western Union has recognized its obligation to carry out the labor-protection provisions set forth in Section 222(f) of the Communications Act.

"The Commission believes that fulfillment by Western Union of its commitments and statutory duties, as described above, will facilitate the retention and stability of the labor force in the telegraph industry. This end might be defeated, however, if jurisdictional disputes and organizational strife among the various groups of organized labor in the industry were permitted to develop over the issue, raised during the hearings of general employee representation. While this problem does not concern this Commission alone, we feel obliged in the public interest to urge that some equitable formula be considered postponing this issue for the duration of the war. Every effort at this time must be concentrated on the paramount task of achieving the maximum level of telegraph service required for successful prosecution of the war."

It is this assumption of the agreement between the Postal and the intervenor by the defendant, and its commitment to observe the seniority rights of the Postal employees, that the plaintiff claims constitute a breach, and a threatened continued breach, of the contract between the plaintiff and defendant, and against which is sought the temporary injunction here under consideration.

It further appears that during the course of the hearings before the Commission, the president of the plaintiff, testifying, stated that, in his opinion, public policy would best be served by giving Postal employees full seniority credit for the time they had spent in the employ of Postal in the event they were subsequently employed by Western Union. It seems, however, from statements made at the hearing on the pending motion, that the governing authority of the plaintiff subsequently took a contrary position and so notified the Commission. It further appears that on September 29, 1943, plaintiff filed a petition with the National Labor Relations Board, seeking certification as collective bargaining representative of all of the employees affected by this litigation, and that such petition, which bears Docket Number 17–R–742, is now pending before the National Labor Relations Board.

At the threshold, it is insisted that the relief here sought is an attack upon the order of the Federal Communications Commission, which order can only be reviewed by the statutory court authorized by 47 U.S.C.A. § 402(a). The plaintiff, however, insists that this is an action for relief under its contract with the defendant, and its rights thereunder are not affected by the action of the Commission. Viewed in that light, this Court must consider whether or not preliminary injunctive relief should be granted.

■ It is also urged that, the Congress having committed to the National Labor Relations Board the function of determin-

ing the units appropriate for the purpose of collective bargaining and the designation of the exclusive representative of all employees in such units, this Court is without jurisdiction to grant the relief here sought. Unquestionably, this Court does not have jurisdiction to determine those matters above referred to which have been committed to the National Labor Relations Board, but here again the plaintiff insists that it is seeking relief from an alleged breach of its contract by the defendant, and, viewed in that light, it would seem that this Court's jurisdiction is settled by Moore v. Illinois Cent. R. Co., 312 U.S. 630, 61 S.Ct. 754, 85 L.Ed. 1089.

It is not to be doubted that injunctive relief may, and in proper cases should, be granted to enforce rights arising out of the designation of an exclusive representative of all employees of units which have been determined by the National Labor Relations Board; nor is there any doubt that such injunctive relief may, and in proper cases should, be granted to enforce contractual obligations entered into by such representative. It is also well settled that the determination by the National Labor Relations Board of an exclusive representative of employees is binding upon the courts, unless in a statutory proceeding provided for that purpose, the appropriate court alters such determination. And the rule is well settled that the action of the National Labor Relations Board is to be viewed as of the time such action was taken, and ordinarily it is presumed to have continuing effect until, in the light of changed conditions, it is altered by the Board itself. Certainly no formal change in the corporate structure of an employer ought to be permitted to vitiate its relations with its employees, or lessen its obligations under the National Labor Relations Act, 29 U.S.C.A. § 151 et seq.

We have here, however, a situation entirely different from any dealt with in the cases wherein the principles above mentioned have been applied. At the time of the action of the National Labor Relations Board in certifying the plaintiff as the exclusive bargaining representative, and at the time the plaintiff entered into its contract with the defendant, there was not the slightest contemplation that there would be an amalgamation of the defendant with the Postal Telegraph Company. Indeed, such amalgamation was then unlawful. And, the same can be said as to the action of the National Labor Relations Board with respect to the representative of the employees of the Postal and the subsequent contract made by that representative, the intervenor. The legislation which has since enabled a consolidation shows that the Congress was much concerned with the rights of the Postal employees, as well as with these of the Western Union. By the consolidation itself, certain statutory privileges and rights were guaranteed to them, and it is not to be assumed that, by such guaranty, it was intended that they should not have equality of treatment in other respects with the employees of the other party to the consolidation. Quite to the contrary, it seems implicit, if not expressed, in the statute that *all* employees should have the right, after the consolidation, to participate in the choice of a representative, or representatives, who would speak and act in the interest of all employees, and not simply on behalf of those formerly employed by one party to the consolidation. The plaintiff insists that, being the exclusive representative of the units of the Western Union, all former Postal employees come into the consolidated organization, in so far as their seniority rights are concerned, as new employees on the date of the merger. The plaintiff concedes that this would, and insists that it should, subordinate all seniority rights of former Postal employees to those represented by the plaintiff on that date. The large importance of such seniority rights in the relation of the employer to the employee in accordance with both the contracts of the plaintiff and the intervenor need not here be discussed. It is admitted by all concerned. The plaintiff insists, however, that its rights, and the rights of those employees whom it represents, ought not to be adversely affected by the merger. To the extent that parity, rather than subordination, adversely affects plaintiff's contract, there can be no doubt that the statute authorizing the consolidation itself in large measure has that effect. The public policy, as reflected in that legislation, favors parity as against subordination. That parity would occasion some hardship to the employees represented by the plaintiff, but no more so than it would the employees represented by the intervenor, may well be true, but such hardship would seem incomparable to that which complete destruction of their seniority rights would visit upon the latter.

It will become necessary, after a final hearing in this cause, for the Court to construe the plaintiff's contract, and determine, in the light of the legislation and the approved consolidation pursuant thereto, whether or not the action of the defendant complained of by the plaintiff constitutes a breach of such contract, as so construed. A preliminary injunction ought not to be granted respecting the breach of a contract, unless it is clear that the action complained of would constitute such a breach; and this is particularly so where excessive hardship would be occasioned thereby. I do not consider that the action of the defendant complained of, in the circumstances here present, constitutes a clear breach of plaintiff's contract.

Furthermore, as stated by the Supreme Court in the case of Virginian R. Co. v. System Federation, etc., 300 U.S. 515, at page 552, 57 S.Ct. 592, at page 601, 81 L. Ed. 789: "Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." There can be no doubt that the public interest is here seriously involved, and, as determined by the Federal Communications Commission, weighs against the granting of injunctive relief.

My conclusion is that a preliminary injunction should not be granted, and the motion therefor will be denied.