TRUCK DRIVERS AND HELPERS, LOCAL UNION 568, Affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

RED BALL MOTOR FREIGHT, INC. and Union of Transportation Employees, Respondents,

Truck Drivers and Helpers, Local Union 568, Affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Intervenor.

Nos. 20077, 20131.

United States Court of Appeals District of Columbia Circuit.

Argued Oct. 27, 1966.

Decided May 18, 1967.

---

Mr. David R. Richards, Kansas City, Mo., for petitioner in No. 20,077 and intervenor in No. 20,131.

Mrs. Nancy M. Sherman, Atty., N.L.R.B., with whom Messrs. Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, and Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., were on the brief, for petitioner in No. 20,131 and respondent in No. 20,077.

Mr. Allen Schoolfield, Jr., Dallas, Tex., of the bar of the Supreme Court of Texas, pro hac vice, by special leave of court, with whom Mr. J. Parker Connor, Washington, D. C., was on the brief, for respondent Red Ball Motor Freight, Inc., in No. 20,131.

Mr. F. Lynn Estep, Jr., Dallas, Tex., of the bar of the Supreme Court of Texas, pro hac vice, by special leave of court, with whom Mr. Thomas P. Brown, III, Washington, D. C., was on the brief, for respondent Union of Transportation Employees in No. 20,131.

Before WILBUR K. MILLER, Senior Circuit Judge, and WRIGHT and McGOWAN, Circuit Judges.

McGOWAN, Circuit Judge:

These statutory review proceedings under the National Labor Relations Act, 29 U.S.C. § 151 et seq. (1964), involve findings by the Board that (1) the respondent employer, Red Ball Motor Freight, Inc. ("Company") violated Sections 8(a) (1), (2), and (3) of the Act, and (2) the respondent Union of Transportation Employees ("UTE") violated Section 8(b) (1) (A). Each respondent challenges these findings in opposing the Board's petition to enforce in No. 20,131. In No. 20,077, the charging party, Truck Drivers and Helpers Local Union 568 ("Teamsters"), complains of the Board's failure (1) to find more individual employees to be the victims of the Company's 8(a) (1) and (3) violations, and (2) to disestablish UTE as the collective bargaining representative of any of the Company's employees. We have concluded that the Board's order should be enforced as it stands, unmodified by reason of any of the contentions urged upon us by the Company or the two unions.

I

The issues here were generated by the Company's acquisition of another trucking company in Shreveport, Louisiana, and its subsequent action in unifying the terminals from which each had formerly operated in that city. The acquired business had used for some years a facility known as the Abbey Street terminal; and the Teamsters were the recognized bargaining representative of its approximately 30 employees working as drivers and dockworkers at that terminal. The Company's terminal was in another part of the city. Known as the Airport Drive terminal, its 50 workers were represented by UTE.

Some two years after the original acquisition, the Company notified the two unions of its intention to close the older and more inefficient Abbey Street terminal, and to consolidate all Shreveport operations at the Airport Drive terminal. The Company met with the unions, and, on September 1, 1964, agreement was reached that the Company would initiate representation proceedings to determine which of the two unions the majority of the combined employees wished to represent them all. It was also agreed that the existing contract of the winning union would apply to all of the employees. The agreement further comprehended an undertaking by the Company to negotiate with the successful union on all issues "arising from the integration of employees and/or the closing of the Abbey Street terminal."

UTE promptly convened meetings of its members at which it addressed itself immediately and decisively to the critical question of what seniority principles should be applied in consolidating the two working forces. UTE officers represented that it would never agree to the dovetailing of the seniority lists, as would be the case if the Teamsters won. They prepared and exhibited comparative lists, one placing all UTE employees above the Teamsters, and the other in-

tegrating the two groups on the basis of individual seniority. Although there appeared to be no factual basis for doing so, they represented that about 15 jobs would be abolished by reason of the merger; and they noted that some 15 or 16 Teamsters had higher seniority than UTE members. The latter were assured that UTE would protect them at all events against these contingencies by an adamant position on seniority integration. UTE put this in writing by a letter distributed on September 9, the day before the consent election.[1] This letter was by way of comment upon a letter previously distributed by the Teamsters which stated that "whichever union wins the election will be under a duty of representing fairly all the employees in the bargaining unit;" and which went on to suggest that that duty could be discharged by the dovetailing of the rosters. UTE won the election on September 10 by a narrow margin, but the Teamsters filed objections. The Regional Director, after the hearing, sustained the one of these objections founded upon the seniority representations. He set aside the election, and ordered a new one to be held.

Before the second election was held on December 2, the Company actually closed the Abbey Street terminal and shifted the work to the Airport Drive terminal. Although the two groups of employees were now working side by side, the Company decided to let each continue under the terms of its contract until the representation issue was settled. The Board found that during this period the Company discriminated between the Teamsters and UTE in affording overtime work, and that the Company brought the results of this discrimination

to the attention of the employees as an incentive to vote for UTE in the impending election. When that election was held, UTE again prevailed by a very narrow margin. Again the Teamsters objected, and again the election was set aside. The unfair labor practice charges against UTE and the Company derived, respectively, from the conduct described above prior to the first and second elections.

II

█ The Company's objections to the finding of unfair labor practices on its part present only issues of fact. These revolve around evidence to the effect that the Company deliberately discriminated between UTE and the Teamsters in the assignment of overtime, with the result that seven members of the latter were adversely affected. We have examined the record in this regard, and we are unable to say that it does not provide adequate support for the Board's findings as to the seven. Neither is it without foundation for the conclusion that the Company's discrimination in this respect was motivated by a purpose to favor and to assist one union at the expense of another. These facts variously add up to violations of Sections 8(a) (1), (2), and (3). See International Ass'n of Machinists, etc. v. NLRB, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50 (1940); Reserve Supply Corp. v. NLRB, 317 F.2d 785 (2d Cir. 1963); Trumbull Asphalt Co. of Del. v. NLRB, 314 F.2d 382 (7th Cir.), cert. denied, 374 U.S. 808, 83 S.Ct. 1697, 10 L.Ed.2d 1032 (1963).

█ We have also considered the Teamsters' claims that the Board erred in limiting its finding of actual discrimination to the seven employees, and in

1. The letter concluded:
"Even if seniority is dovetailed, you know a majority of UTE employees will go to the bottom of the board should the Teamsters win.
"When the Union of Transportation Employees wins the election, the Teamsters Union will have no bargaining rights and no say-so at all. You can rest assured that the Union of Transportation

Employees will *never* agree that its members will go to the bottom of any seniority list and that your seniority will be respected and protected against all others. Do not be fooled by long, legal, complicated letters. This is a plain statement of the position of the Union of Transportation Employees." [Emphasis in original.]

not including in its remedies an immediate disestablishment of UTE as a bargaining representative. As to the former, we are satisfied that the Board was rational in differentiating as it did between the members of the Teamsters. As to the second contention, when we recall the traditional latitude accorded the Board in choosing among remedies, we find no occasion to interfere. The issue of possible domination of UTE by the Company was not in this case; and the Supreme Court has pointed out that "an assisted but undominated union" may reasonably be expected to function as a true employee bargaining representative "after the effects of the employer's unfair labor practices have been dissipated." NLRB v. District 50, UMW (Bowman Trans., Inc.), 355 U.S. 453, 458–459, 78 S.Ct. 386, 390, 2 L.Ed.2d 401 (1958).

### III

The Board's finding of a Section 8(b) (1) (A) violation against UTE rests upon essentially undisputed facts. But to proceed from these facts to this finding requires preliminary consideration of at least two substantial legal questions. The first is whether a union's refusal fairly to represent all of the employees in its bargaining unit can constitute an unfair labor practice cognizable under the Act. The second is whether a union's adamant stand against the dovetailing of seniority lists can be a violation of that duty of fair representation.

The first question has received extended attention over the years, and has, until very recently, provoked much controversy.[2] Initial enforcement of a union's duty of fair representation, primarily in the racial discrimination area, was procured only in the courts, under the doctrine stated in Steele v. Louisville & Nashville R.R.,[3] and not until 1962 did the National Labor Relations Board respond affirmatively in such cases.[4] On review of that first case, a panel of the Second Circuit divided on the question, with only Judge Friendly explicitly accepting the Board's ruling, there made in a non-racial context, that a union's demand that one of its members be docked in seniority for minor infractions of leave-time rules constituted an unfair labor practice. NLRB v. Miranda Fuel Co., Inc., 326 F.2d 172 (1963).

Subsequently the doctrine has won firmer acceptance. In Local Union No. 12, United Rubber, Cork, Linoleum & Plastic Workers v. NLRB, 368 F.2d 12 (5th Cir. 1966), the Fifth Circuit, in a persuasive opinion by Judge Thornberry, held that a union's summary refusal to process grievances of its Negro members violated the Act. Most recently—and most importantly—the Supreme Court, on February 27 of this year in Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 assumed in terms the validity of the doctrine. There a majority of five, in a non-racial context and in the course of reversing a state court's determination that a union member could not collect damages from a union which had not pressed his grievance against an employer to arbitration, addressed itself

2. *Compare* Cox, *The Duty of Fair Representation*, 2 VILL.L.REV. 151 (1957) *with* ALBERT, NLRB–FEPC, 16 VAND. L.REV. 547 (1963). See also Sovern, *The National Labor Relations Act and Racial Discrimination*, 62 COLUM.L. REV. 563 (1962) ; Sovern, *Race Discrimination and the National Labor Relations Act: The Brave New World of Miranda*, N.Y.U. 16th Annual Conference on Labor 3 (1963) ; Summers, *Individual Rights in Collective Agreements and Arbitration*, 37 N.Y.U.L. REV. 362 (1962) ; Wellington, *Union Democracy and Fair Representation: Federal Responsibility in A Federal System*, 67

YALE L.J. 1327 (1958) ; Comment, *Discrimination and the NLRB*, 32 U.CHI. L.REV. 124 (1964) ; Comment, *Racial Discrimination and the Duty of Fair Representation*, 65 COLUM.L.REV. 273 (1965) ; Note, *Administrative Enforcement of the Right to Fair Representation*, 112 U.PA.L.REV. 711 (1964).

3. 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944). *E.g.*, Syres v. Local 23, Oil Workers, 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785 (1955).

4. Miranda Fuel Co., 140 N.L.R.B. 181 (1962).

to the question of federal preemption. A necessary premise of the majority's statement that Labor Board jurisdiction in such cases does not exclude court relief was its explicit assumption that unfair representation is an unfair labor practice.[5]

As for the second question, the standards to be applied in determining what union acts of commission or omission are in violation of its duty of fair representation under the Act remain largely to be drawn. Only recently has the Board begun to articulate the characteristics of unfair representation as it has begun more actively to entertain complaints of this nature.[6] On the narrow question before us, we need not concern ourselves with what may eventually prove to be the precise contours of a union's duty fairly to represent all of the employees for whom it speaks, for there are cases which indicate that union action taken solely for considerations of political expediency, and unsupported by any rational argument whatsoever, is in violation of representational responsibilities. In Ferro v. Railway Express Agency, Inc., 296 F. 2d 847 (2d Cir. 1961), the trial court had dismissed a complaint brought against their union by workers who, after losing their jobs in a merger, had sought positions elsewhere in the system under a contract permitting them to follow their work. The union negotiated a settlement excluding them, allegedly because it desired to discriminate in favor of a po-litically stronger local. The Court of Appeals, stating that "it is not proper for a bargaining agent in representing all of the employees to draw distinctions among them which are based upon their political power within the union," directed that the plaintiffs' complaint under the Railway Labor Act be reinstated. Id. at 851. Similarly, in Gainey v. Brotherhood of Railway and Steamship Clerks, 313 F.2d 318, 324 (1963), the Third Circuit characterized the "arbitrary sacrifice of a group of employees' rights in favor of another stronger or more politically favored group" as one of the major categories of cases comprised within the Steele doctrine.[7]

▮ The merger situation poses notoriously difficult problems in accommodating the interests of theretofore independent groups of employees.[8] It frequently, although by no means invariably in an expanding economy, raises the dread spectre of job-loss for workers with relatively long records of stable employment. Many different formulae for reconciliation have been attempted, and more have been suggested, as methods for alleviating the discord over seniority when two groups of employees are joined. It is not our function to prefer one as against any other. But it seems clear to us, as it did to the Board on the undisputed evidence before it, that UTE has renounced any good faith effort to reconcile the interests of the employees formerly at the Abbey Street depot with

5. In a concurring opinion in which the Chief Justice and Mr. Justice Harlan joined, Mr. Justice Fortas stated that "a claim that the union has breached its statutory duty of fair representation * * * is a claim of unfair labor practice * * *" 87 S.Ct. at 922 (1967).

6. Cargo Handlers, Inc., 159 N.L.R.B. No. 17, 62 L.R.R.M. 1228 (1966); Independent Metal Workers Union, Local 1 (Hughes Tool Co.), 147 N.L.R.B. 1573 (1964); Local 1367, International Longshoremen's Ass'n (Galveston Maritime Ass'n), 148 N.L.R.B. 897 (1964).

7. Cf. Mount v. Grand Int'l Brotherhood of Locomotive Eng'rs, 226 F.2d 604 (6th Cir. 1955), cert. denied, 350 U.S. 967, 76 S.Ct. 436, 100 L.Ed. 839 (1956); Hargrove v. Bhd. of Locomotive Eng'rs, 116 F.Supp. 3 (D.D.C.1953); see also O'Donnell v. Pabst Brewing Co., 12 Wis.2d 491, 107 N.W.2d 484, 90 A.L.R.2d 995 (1961).

8. Cf. Kahn, Seniority Problems in Business Mergers, 8 IND. & LAB.REL.REV. 361, 378 (1955); Mater & Mangum, The Integration of Seniority Lists in Transportation Mergers, 16 IND. & LAB.REL. REV. 343 (1963); Blumrosen, The Worker and Three Phases of Unionism: Administrative and Judicial Control of the Worker-Union Relationship, 61 MICH.L.REV. 1435, 1482 (1963).

those at the Airport Drive terminal.[9] It raised no questions with respect to the merits of dovetailing, such as that some jobs are more difficult of execution or require more training than others.[10] There has been no indication that the Abbey Street operation was unsuccessful and that its employees, had they not followed the work to Airport Drive, would have lost their jobs altogether. UTE has, in sum, failed to come forward with any reason at all for preferring the Airport Drive employees other than the purely political motive of winning an election by a promise of preferential representation to the numerically larger number of voters.[11]

9. *Cf.* the Supreme Court's elucidation of not only the duty imposed upon the union but also the discretion which must be accorded it in Ford Motor Co. v. Huffman, 345 U.S. 330, 337–339, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953). In the related context of negotiations resulting in preferential seniority rights for some veterans but not for others, the Court said:

> That the authority of bargaining representatives * * * is not absolute is recognized in Steele v. Louisville & N. R. Co. * * *. Their statutory obligation *to represent all members of an appropriate unit requires them to make an honest effort to serve the interests of all of those members, without hostility to any.* * * * The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a *statutory bargaining representative* in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.
>
> Compromises on a temporary basis, with a view to long range advantages, are natural incidents of negotiation. Differences in wages, hours and conditions of employment reflect countless variables. Seniority rules governing promotions, transfers, layoffs and similar matters may, in the first instance, revolve around length of competent service. Variations acceptable in the discretion of bargaining representatives, however, may well include differences based upon such matters as the unit within which seniority is to be computed, the privileges to which it shall relate, the nature of the work, the time at which it is done, the fitness, ability or age of the employees, their family responsibilities, injuries received in course of service, and time or labor devoted to related public service, whether civil or military, voluntary or involuntary.

10. The Board may legitimately measure other proposals for handling the problems occasioned by merging the seniority rosters by a dovetailing standard, as experience has demonstrated it generally to be an equitable and feasible solution in other situations. See, *e.g.*, Humphrey v. Moore, 375 U.S. 335, 347, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964) and authorities cited in footnote 10; O'Donnell v. Pabst Brewing Co., 12 Wis.2d 491, 107 N.W.2d 484 (1961), *cf.* Kent v. CAB, 204 F.2d 263 (2d Cir.), *cert. denied*, 346 U.S. 826, 74 S.Ct. 46, 98 L.Ed. 351 (1953); Kahn, *supra*, at 373–78. The condemnations of refusal to dovetail are legion. *E.g.*, Commercial Telegraphers' Union v. Western Union Telegraph Co., 53 F.Supp. 90, 96 (1943); In re City of Green Bay, Wisconsin, 44 LAB.ARB. 311, 315 (1965); Blumrosen, *Union-Management Agreements Which Harm Others*, 10 JOURNAL OF PUBLIC LAW 345, 371 (1961). Apparently most employees have come to accept dovetailing as the preferred procedure when mergers occur. In discussing the fair representation duty in a hypothetical merger situation, Professor Wellington has concluded that "where company A acquired company B, and the B employees were treated as new employees for the purpose of seniority, the union would be in a breach of duty. Although position on the seniority ladder is subject to revision, bargaining for its total elimination seems clearly outside the expectation of the employee community. Some sort of dovetailing would accordingly be required to approximate community expectation." Wellington, *Union Democracy and Fair Representation: Federal Responsibility in A Federal System*, 67 YALE L.J. 1327, 1360–61 (1958).

11. *Cf.* Professor Blumrosen's proposal that before a union abridges seniority rights it be required to demonstrate "not only that it exercised an honest judgment but also that it made an appropriate decision, one based on objective factors, which would persuade a rational decision-maker, and not compelled by the internal political make-up of the union." Blumrosen, *supra* note 8, at 1482. *Compare* NLRB v. Wheland Co., 271 F.2d 122 (6th Cir. 1959).

## IV

That UTE's fulfillment, if it won the election, of its campaign promise to discriminate against the Teamster employees would constitute an unfair labor practice does not finally resolve the precise issue before us. Here there is only threatened action, promised by a union which is not yet an exclusive bargaining agent. Neither *United Rubber Workers* nor the Board's decision in *Miranda* resolves this issue. In each of those cases the union had been for some time the exclusive bargaining agent, and any duty to represent all employees in its unit had, by definition, already attached. Here neither UTE nor the Teamsters had as yet become the exclusive bargaining agent for all employees at the consolidated Airport Drive operation.[12]

■ Thus the question is whether *threatened* action which *would* violate a union's fair representation duty constitutes an unfair labor practice. To this specific point no court has addressed itself, and we find in this regard scant assistance from decisions of the Board. Cf. Local 55, St. Louis Offset Printing Union, AFL-CIO (Mendle Press), 130 N.L.R.B. 324 (1961), where a union threat to induce an employer to take retaliatory action was found violative of Section 8(b) (1) (A). Because UTE is not yet the exclusive bargaining agent for all of the employees in the unit, it is necessary to find other circumstances indicating coercion or restraint of Section 7 rights in order to affirm the existence of an unfair labor practice under Section 8(b) (1) (A).

Those circumstances, we think, consist in this: UTE has not only pledged itself to violate its fair representation duty in the future, but that very commitment presently restrains the employees of the bargaining unit in the exercise of their Section 7 right to freedom of choice in the selection or rejection of a bargaining representative. The combination of (1) the promise of illegal action and (2) the contribution of that illegal promise to impairment of freedom of choice leads us here to affirm the Board's finding that UTE has committed an unfair labor practice.[13]

■ Section 7, which is set forth in the margin,[14] is instinct with the idea

12. It is by no means clear that all campaign promises which, if effected, might arguably constitute unfair labor practices are required to be treated by the Board as unfair labor practices. The setting aside of the election may be an adequate remedy without pressing the matter further. Pledges made in the full flush of election campaigning are notoriously fragile and represent a form of speech which frequently falls short of action. We note, however, that this record shows the Board as having already set aside two elections at Airport Drive, and the representation dispute remains unresolved.

13. Professors Cox and Bok have suggested that the soundest course would be to confine Section 8(b) (1) to three classes of cases: "(1) cases of physical violence and intimidation, including mass picketing in connection with an organizational strike; (2) cases involving the deliberate deception of individuals as distinguished from allegedly false propaganda and general promises or accusations; (3) threats to use the power of the union to take economic reprisals against specific individuals if they fail to join, as distinguished from the use of bargaining power in arranging terms and conditions of employment." Cox & Bok, Cases and Materials on Labor Law 330–31 (1962). At the time their suggestions were made, unfair representation had not been recognized as an unfair labor practice. Although it may in future seem reasonable to add to their formulation a fourth classification of cases where a union had threatened to violate its duty of fair representation, the threats to refuse seniority privileges to the Teamsters here would seem to approximate the third category suggested, although of course a Teamster's seniority would be threatened even if he did vote for UTE.

14. "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may

of free choice. If it means anything at all, it is that employees shall not be subjected to improper pressures or influences in their selection of a union to represent them. On this record the Board has found on adequate evidence that UTE arbitrarily adopted and announced a bargaining policy on seniority merger motivated only by a desire to win the votes of a majority of the employees at the Airport Drive terminal. The actual effectuation of that policy would, under the circumstances, constitute a default by UTE in its obligation to represent fairly all the employees in the unit for which it becomes the exclusive bargaining representative.

We think the Board could conclude that this campaign activity by UTE inevitably introduced improper influences into the election process tantamount to the restraint or coercion contemplated by Section 7. By holding out the inducement of seniority preferences to the UTE employees, UTE conceivably restrained some Teamster members from expressing a choice for UTE which they might otherwise have had or, as is more probably the case, it may have made the alternative of no union at all appear to be the lesser evil. It may well have had a similarly restraining effect [15] upon some UTE members who may have been attracted to the Teamsters by the generally more advantageous terms of the Teamster contract with the Company.[16] Because interjection of what would be an illegal union policy into the campaign may have coerced members of both unions into thinking they had best sit tight with their current representation, it seems probable that employees were restrained from the full exercise of "the complete and unhampered freedom of choice which the Act contemplates." International Ass'n of Machinists, Tool & Die Workers Lodge No. 35 v. NLRB, 311 U.S. 72, 80, 61 S.Ct. 83, 88, 85 L.Ed. 50 (1940).[17]

be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a) (3)." 61 Stat. 140, 29 U.S.C. § 157 (1964).

15. An employer's promises of benefit are sometimes at least as efficacious as threatened detriment in discouraging union activity, and have been found to be violative of Section 8(a) (1). E. g., Joy Silk Mills v. NLRB, 87 U.S.App.D.C. 360, 367, 185 F.2d 732, 739 (1950), cert. denied, 341 U.S. 914, 71 S.Ct. 734 (1951). In framing Section 8(b) (1) (A), it was Congress' intention to impose upon unions the same restrictions which the Wagner Act imposed upon employers with respect to violations of employee rights. International Ladies' Garment Workers' Union, AFL-CIO v. NLRB, 366 U.S. 731, 738, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961). A union's promise of benefit may be as disruptive of free choice as a threat, and may exert no less restraining influence on that choice. Cf. NLRB v. Gilmore Indust., Inc., 341 F.2d 240 (6th Cir. 1965); NLRB v. Gorbea, Perèz & Morell S. en C., 328 F.2d 679, 680 (1st Cir. 1964); Sewell Mfg. Co., 138 N.L.R.B. 66, 70 (1962). The potential for disruption is all the stronger when the union offers as an inducement that it will violate a statutory duty.

16. The Teamsters' contract provided for overtime pay after 8 hours a day, the UTE contract after 10. The Teamsters' contract, unlike the UTE contract, called for overtime pay for work on the sixth day and doubletime for work on the seventh. Under the Teamsters' contract an employee was entitled to a 3-week vacation after 11 years of service and 4 weeks after 16 years, whereas under the UTE contract 3 weeks were allowed only after 12 years and no provision was made for a 4-week vacation. The Teamsters' contract also provided superior employer-supported pension, health and welfare plans, and employee cost-of-living allowances.

17. The possibility that considerations like these may have significantly affected the ultimate choice of the bargaining representative is evident from the figures. At the Abbey Street terminal there had been approximately thirty employees, and all were Teamsters both before and after the merger. At the Airport Drive terminal were approximately fifty employees, all of whom were UTE members both before and after the merger. At the first election 37 ballots were cast for the Teamsters, 39 for UTE, and 2 were challenged. At the second election 36 ballots were cast for the Teamsters, 38 for UTE, 1 for neither union, and 6 were challenged.

In any event, a campaign pledge by a union seeking the favor of two groups of employees that it will, deliberately and without any pretense to rational justification in fact or theory, discriminate against one in the exercise of the exclusive bargaining rights conferred by Section 9 of the Act is not compatible with the free election premises of Section 7. On this record we believe the Board was acting within the scope of the Act when it found UTE to have violated Section 8(b) (1) (A).

The Board's order is affirmed in all respects, and may be enforced.

It is so ordered.

WILBUR K. MILLER, Senior Circuit Judge, concurs in the result.