311 U.S. 72 (1940)
INTERNATIONAL ASSOCIATION OF MACHINISTS; TOOL AND DIE MAKERS LODGE NO. 35, ETC.
v.
NATIONAL LABOR RELATIONS BOARD.
No. 16.
Supreme Court of United States.
Argued October 24, 1940.
Decided November 12, 1940.
CERTIORARI TO THE COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA.
*73 Mr. Joseph A. Padway, with whom Mr. Herbert S. Thatcher was on the brief, for petitioners.
Mr. Robert B. Watts, with whom Solicitor General Biddle, Assistant Solicitor General Fahy, and Messrs. Thomas E. Harris, Laurence A. Knapp, Mortimer B. Wolf and Miss Ruth Weyand were on the brief, for respondent.
MR. JUSTICE DOUGLAS delivered the opinion of the Court.
There are two questions here for decision: (1) whether on the facts of this case the National Labor Relations Board was without authority in finding that an industrial unit was appropriate for collective bargaining purposes to the exclusion of a craft unit; and (2) *74 whether the Board had authority to require the employer to bargain with that industrial unit, despite a claim submitted to the Board by the craft unit before the order issued that the latter then had been designated by a majority of all the employees. We granted certiorari because of the importance of these questions in the administration of the National Labor Relations Act (49 Stat. 449) and because of an asserted conflict between the decision below (71 App. D.C. 175; 110 F.2d 29) and Hamilton-Brown Shoe Co. v. National Labor Relations Board, 104 F.2d 49, on the second question.
The Board found, in proceedings duly had under § 10 of the Act, that the employer, Serrick Corporation, had engaged in unfair labor practices within the meaning of the Act. It ordered the employer to cease and desist from those practices and to take certain affirmative action. More specifically, it directed the employer to cease giving effect to a closed-shop contract with petitioner[1] covering the toolroom employees; to deal with U.A.W., an industrial unit,[2] as the exclusive bargaining agent of its employees, including the toolroom men; to desist from various discriminatory practices in favor of petitioner and against U.A.W.; and to reinstate and make whole certain employees who had been improperly discharged. The employer has complied with the Board's order. But petitioner, an intervener in the proceedings before the Board, filed a petition in the court below to review and set aside those portions of the order which direct the employer to cease and desist from giving effect to its closed-shop contract with petitioner and to bargain exclusively with U.A.W. The court below affirmed the order of the Board.
*75 Abrogation of petitioner's closed-shop contract.  The Board found that the closed-shop contract between petitioner and the employer was invalid under § 8 (3) of the Act[3] because it had been "assisted" by unfair labor practices of the employer, because petitioner did not represent an uncoerced majority of the toolroom employees at the time the contract was executed, and because for this and other reasons it was not an appropriate bargaining unit. We think there was substantial evidence that petitioner had been assisted by unfair labor practices of the employer and that therefore the Board was justified in refusing to give effect to its closed-shop contract.
Since the court below has confirmed the findings of the Board there is no need to review the evidence in detail. National Licorice Co. v. National Labor Relations Board, 309 U.S. 350, 357. It is clear that the employer had an open and avowed hostility to U.A.W. It is plain that the employer exerted great effort, though unsuccessfully, to sustain its old company union, the Acme Welfare Association, as a bulwark against U.A.W. And it is evident that the employer, while evincing great hostility to U.A.W. in a contest to enlist its production force, acquiesced *76 without protest in the organization by petitioner of the toolroom employees. The main contested issue here is narrowly confined. It is whether or not the employer "assisted" the petitioner in enrolling its majority.
Fouts, Shock, Dininger, Bolander, Byroad and Baker were all employees of the toolroom. Four of these  Fouts, Shock, Byroad and Bolander  were old and trusted employees. Fouts was "more or less an assistant foreman," having certain employees under him. Shock was in charge of the toolroom during the absence of the foreman. Dininger and Bolander were in charge of the second and third shifts respectively, working at night. Prior to mid-July, 1937, they had been actively engaged on behalf of the company union. When it became apparent at that time that the efforts to build up that union were not successful, Fouts, Shock, Byroad and Bolander suddenly shifted their support from the company union to petitioner and moved into the forefront in enlisting the support of the employees for petitioner. The general manager told Shock that he would close the plant rather than deal with U.A.W. The superintendent and Shock reported to toolroom employees that the employer would not recognize the C.I.O. The superintendent let it be known that the employer would deal with an A.F. of L. union. At the same time the superintendent also stated to one of the employees that some of the "foremen don't like the C.I.O." and added, with prophetic vision, that there was "going to be quite a layoff around here and these fellows that don't like the C.I.O. are going to lay those fellows off first." During working hours, Byroad conducted a straw vote among the employees and under the direction of Fouts and Shock left the plant to seek out an organizer for petitioner. Fouts solicited among workmen in the toolroom stating that his purpose was to "beat" the U.A.W. For a week preceding August 13, Shock spent much time, as did Byroad, going "from one *77 bench to another soliciting" for petitioner. Baker likewise solicited. Dininger offered an employee a "good rating" if he would join petitioner. Not less than a week before August 13, the personnel director advised two employees to "join the A.F. of L." Byroad spent considerable time during working hours soliciting employees, threatening loss of employment to those who did not sign up with petitioner and representing that he was acting in line with the desires of the toolroom foreman, McCoy. This active solicitation for petitioner was on company time and was made openly in the shop. Much of it was made in the presence of the toolroom foreman, McCoy, who clearly knew what was being done. Yet the freedom allowed solicitors for petitioner was apparently denied solicitors for U.A.W. The plant manager warned some of the latter to check out their time for a conference with him on U.A.W. and questioned their right to discuss U.A.W. matters on company property. The inference is justified that U.A.W. solicitors were closely watched, while those acting for petitioner were allowed more leeway.
Five U.A.W. officials had been discharged in June, 1937, because of their union activities. The known antagonism of the employer to U.A.W. before petitioner's drive for membership started made it patent that the employees were not free to choose U.A.W. as their bargaining representative. Petitioner started its drive for membership late in July, 1937, and its closed-shop contract was signed August 11, 1937.[4] On August 10, 1937, the U.A.W., having a clear majority of all the employees, presented to the employer a proposed written contract for collective bargaining. This was refused. On August 13, 1937, all toolroom employees who refused membership in petitioner, some 20 in number were discharged. *78 On August 15, 1937, the management circulated among the employees a statement which, as found by the Board, was a thinly veiled attack on the U.A.W. and a firm declaration that the employer would not enter into any agreement with it.
Petitioner insists that the employer's hostility to U.A.W. cannot be translated into assistance to the petitioner and that none of the acts of the employees above mentioned, who were soliciting for petitioner, can be attributed to the employer.
We disagree with that view. We agree with the court below that the toolroom episode was but an integral part of a long plant controversy. What happened during the relatively brief period from late July to August 11, 1937, cannot properly be divorced from the events immediately preceding and following. The active opposition of the employer to U.A.W. throughout the whole controversy has a direct bearing on the events during that intermediate period. Known hostility to one union and clear discrimination against it may indeed make seemingly trivial intimations of preference for another union powerful assistance for it. Slight suggestions as to the employer's choice between unions may have telling effect among men who know the consequences of incurring that employer's strong displeasure. The freedom of activity permitted one group and the close surveillance given another may be more powerful support for the former than campaign utterances.
To be sure, it does not appear that the employer instigated the introduction of petitioner into the plant. But the Board was wholly justified in finding that the employer "assisted" it in its organizational drive. Silent approval of or acquiescence in that drive for membership and close surveillance of the competitor; the intimations of the employer's choice made by superiors; the fact that the employee-solicitors had been closely identified with *79 the company union until their quick shift to petitioner; the rank and position of those employee-solicitors; the ready acceptance of petitioner's contract and the contemporaneous rejection of the contract tendered by U.A.W.; the employer's known prejudice against the U.A.W. were all proper elements for it to take into consideration in weighing the evidence and drawing its inferences. To say that the Board must disregard what preceded and what followed the membership drive would be to require it to shut its eyes to potent imponderables permeating this entire record. The detection and appraisal of such imponderables are indeed one of the essential functions of an expert administrative agency.
Petitioner asserts that it had obtained its majority of toolroom employees by July 28, 1938, and that there was no finding by the Board that that majority was maintained between then and the date of execution of the closed-shop contract by unfair labor practices. In this case, however, that is an irrelevant refinement. The existence of unfair labor practices throughout this whole period permits the inference that the employees did not have that freedom of choice which is the essence of collective bargaining. And the finding of the Board that petitioner did not represent an uncoerced majority of toolroom employees when the closed-shop contract was executed is adequate to support the conclusion that the maintenance as well as the acquisition of the alleged majority was contaminated by the employer's aid.
Petitioner attacks the Board's conclusion that its membership drive was headed by "supervisory" employees  Fouts, Shock, Dininger and Bolander. According to petitioner these men were not foremen, let alone supervisors entrusted with executive or directorial functions, but merely "lead men" who by reason of long experience were skilled in handling new jobs and hence directed the set-up of the work. Petitioner's argument is that since these *80 men were not supervisory their acts of solicitation were not coercive and not attributable to the employer.
The employer, however, may be held to have assisted the formation of a union even though the acts of the so-called agents were not expressly authorized or might not be attributable to him on strict application of the rules of respondeat superior. We are dealing here not with private rights (Amalgamated Utility Workers v. Consolidated Edison Co., 309 U.S. 261) nor with technical concepts pertinent to an employer's legal responsibility to third persons for acts of his servants, but with a clear legislative policy to free the collective bargaining process from all taint of an employer's compulsion, domination, or influence. The existence of that interference must be determined by careful scrutiny of all the factors, often subtle, which restrain the employees' choice and for which the employer may fairly be said to be responsible. Thus, where the employees would have just cause to believe that solicitors professedly for a labor organization were acting for and on behalf of the management, the Board would be justified in concluding that they did not have the complete and unhampered freedom of choice which the Act contemplates.[5] Here there was ample evidence to support that inference. As we have said, Fouts, Shock, Dininger and Bolander all had men working under them. To be sure, they were not high in the factory hierarchy and apparently did not have the power to hire or to fire. But they did exercise general authority over the employees and were in a strategic position to translate to their subordinates the policies and desires of the management. It is clear that they did exactly that. Moreover, three of them  Fouts, Shock and Bolander  had been actively engaged during the preceding *81 weeks in promoting the company union. During the membership drive for petitioner they stressed the fact that the employer would prefer those who joined petitioner to those who joined U.A.W. They spread the idea that the purpose in establishing petitioner was "to beat the C.I.O." and that the employees might withdraw from the petitioner once this objective was reached. And in doing these things they were emulating the example set by the management. The conclusion then is justified that this is not a case where solicitors for one union merely engaged in a zealous membership drive which just happened to coincide with the management's desires. Hence the fact that they were bona fide members of petitioner did not require the Board to disregard the other circumstances we have noted.
By § 8 (3) of the Act discrimination upon the basis of union membership constitutes an unfair labor practice unless made because of a valid closed-shop contract. But that section authorizes an order under § 10 abrogating such a contract with a labor organization which has been assisted by unfair labor practices. The presence of such practices in this case justified the Board's conclusion that petitioner did not represent an uncoerced majority of the toolroom employees. §§ 7, 8 (1). This conclusion makes it unnecessary to pass upon the scope of the Board's power to determine the appropriate bargaining unit under § 9 (b).
Alleged change in status of petitioner.  Petitioner challenges the order directing the employer to bargain exclusively with U.A.W., on the ground that prior to the issuance of the order petitioner had obtained an overwhelming majority of the production employees and had so notified the Board. Petitioner made no showing at the hearing that a majority of the employees had shifted to it after the employer refused to bargain with U.A.W. Nor did it seek leave from the court below to adduce *82 such additional evidence pursuant to § 10 (e). Nevertheless it contends that the Board on receipt of the notification should have ordered an election or at least have made an investigation.
We agree with the court below that the Board in failing to act on this request did not commit error. This was not a certification proceeding[6] under § 9 (c); it was an unfair labor practice proceeding under § 10. Where as a result of unfair labor practices a union cannot be said to represent an uncoerced majority, the Board has the power to take appropriate steps to the end that the effect of those practices will be dissipated. That necessarily involves an exercise of discretion on the part of the Board  discretion involving an expert judgment as to ways and means of protecting the freedom of choice guaranteed to the employees by the Act. It is for the Board, not the courts, to determine how the effect of prior unfair labor practices may be expunged. National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 271; National Labor Relations Board v. Falk Corp., 308 U.S. 453, 461. It cannot be assumed that an unremedied refusal of an employer to bargain collectively with an appropriate labor organization has no effect on the development of collective bargaining. See National Labor Relations Board v. Pacific Greyhound Lines, 303 U.S. 272, 275. Nor is the conclusion unjustified that unless the effect of the unfair labor practices is completely dissipated, the employees might still be subject to improper restraints and not have the complete freedom of choice which the Act contemplates. Hence the failure of the Board to recognize petitioner's notice of change was wholly proper. National Labor Relations Board v. Bradford Dyeing Assn., 310 U.S. 318, 339-340.
*83 Sec. 9 of the Act provides adequate machinery for determining in certification proceedings questions of representation after unfair labor practices have been removed as obstacles to the employees' full freedom of choice.
Affirmed.
NOTES
[1] Petitioners, labor organizations affiliated with the American Federation of Labor, are treated herein in the singular.
[2] United Automobile Workers of America, Local No. 459 (herein called U.A.W.) is affiliated with the Congress of Industrial Organizations (C.I.O.).
[3] Sec. 8 (3) provides:

"It shall be an unfair labor practice for an employer  . . .
"(3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this Act, or in the National Industrial Recovery Act (U.S.C., Supp. VII, title 15, secs. 701-712), as amended from time to time, or in any code or agreement approved or prescribed thereunder, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this Act as an unfair labor practice) to require as a condition of employment membership therein, if such labor organization is the representative of the employees as provided in section 9 (a), in the appropriate collective bargaining unit covered by such agreement when made."
[4] The contract, though dated August 6, 1937, was actually executed on August 11, 1937.
[5] See Consumers Power Co. v. National Labor Relations Board, 113 F.2d 38, 44. Cf. Swift & Co. v. National Labor Relations Board, 106 F.2d 87, 93.
[6] U.A.W. did in fact file a petition for certification under § 9 (c). But this was dismissed by the Board since it found for reasons stated that U.A.W. was the appropriate bargaining unit.