## NATIONAL LABOR RELATIONS BOARD v. FEDERBUSH CO., Inc.

### No. 230.

Circuit Court of Appeals, Second Circuit.

July 18, 1941.

Christopher W. Hoey, of New York
City, and Robert B. Watts, Gen. Counsel,
Laurence A. Knapp, Associate Gen. Coun-
sel, Ernest A. Gross, Asst. Gen. Counsel,
Frederick M. Davenport, Jr., and Robert
Leland, all of Washington, D. C., Attys.,
National Labor Relations Board, for peti-
tioner.

Jacob E. Hurwitz, of New York City,
for respondent.

Before L. HAND, SWAN, and CHASE,
Circuit Judges.

L. HAND, Circuit Judge.

This is a petition for the usual "enforce-
ment order" of this court to be entered up-
on an order of the National Labor Rela-
tions Board, enjoining the respondent
from refusing to bargain collectively with
a local of the Congress of Industrial Or-
ganizations, and further enjoining it in the
exact words of § 7 of the Act, 29 U.S.C.
A. § 157. An affirmative part of the or-
der directed the respondent to bargain col-
lectively with the local as the exclusive
representative of its employees and to post
the usual notices. The respondent is en-
gaged in the manufacture and sale of
"loose-leaf devices"; it has a small facto-
ry in New York where it employs about
fifty people. A local of the Congress of
Industrial Organizations began to organ-
ize the plant in May, 1939, and the "un-
fair labor practices" of which the Board
found the company guilty consisted of in-
terfering with these organizing activities,
and refusing to bargain collectively with
the union after it had been formed. The
company takes its name from six brothers,
of whom one, Charles, was president, and
another, Irving, was secretary, who togeth-
er were in charge of its labor policies;
two others, Nathaniel and Max, were the
supervisors of the stamping and order de-
partment respectively. All the Federbush
brothers had power to hire and discharge
employees. The company's only interfer-
ence with organizing the local which the
Board proved was as follows. One of the
employees, Napoli, was active in his ef-
forts to organize the factory, and in June,
1939, Nathaniel Federbush in a talk with
him said that the union was "just a bunch
of racketeers * * * trying to collect dues
and it won't get you anywhere in the end.
They won't secure you a job." After Na-
poli had told him that he had already ap-
plied for membership and received a card,
Federbush added that if the plant was or-
ganized, the company would be unable to
operate for more than six months a year.
In August, 1939, two other organizers
went to the factory, and on arriving saw
Nathaniel Federbush standing in the door-
way. As they moved off he followed them;
as they supposed, in order to shadow their
activities. In September while Gramacy
and Rogovsky—also organizers—were
standing on the steps of a building of
which the company occupied the sixth and
seventh floors, Nathaniel pushed one of
them away, and told him to go to the oth-
er side of the street; and later the eleva-
tor operator at Federbush's direction
chased him away altogether. On October
23rd, Irving Federbush asked Napoli "why
he was turning against the firm by joining
the union," and suggested that he should
come over to the office and talk matters
over. These appear to us trivial matters,
but as the Board has seen fit to make them
the occasion of an injunction, we cannot
say that its order should not be enforced.

The refusal to bargain with the union
after it had been formed, stands on a more
substantial basis. On October 20th, Ro-
govsky and Sandner—both members of the
union—met Irving Federbush, as a repre-
sentative of the company, to discuss condi-
tions of employment. Federbush asked for
proof that they represented a majority of
the employees, and what were their de-
mands. Rogovsky refused to show the
membership cards, but told Federbush the
names of the five members of the shop com-
mittee, and the Board found that Feder-
bush then admitted that he knew the union
represented a majority of the employees.
(This Federbush disputed.) These negoti-
ations proving inconclusive, another meet-

ing took place on October 24th, at which Hurwitz, the company's attorney, alone represented it. He too raised the question of the union's representing a majority, and particularly of the propriety of grouping together employees engaged in "production, maintenance and shipping" with the rest. Hurwitz suggested that the "cutting, binding, stamping, assembling and punching" departments should constitute a separate bargaining "unit," and that the union should prove its right to represent these. That meeting too was inconclusive, and Grasso, one of those present on behalf of the union, arranged another for the next day at the Regional Office of the Board. The union representatives and Hurwitz met at that time and place, and Grasso then said that he had with him the cards which would show the tally, but Hurwitz again raised the question of the proper "unit." Later at that interview, however, he conceded that the union represented a majority of the employees, but said that the company did not like unions, though compelled to deal with them. He would do nothing to "expedite matters," and the company was using the Board for delay; there was "a lot of unnecessary red tape that allows us to stall. But if we agree to negotiate we will dispense with all of that and will call you in and you can come in and we can negotiate the contract." On the evening of October 26th the employees voted to strike, and Grasso so informed Irving Federbush; soon afterwards Hurwitz told Grasso that the company would negotiate, but on the 27th he again failed to do so, saying that the union should not be impatient, and that the company's position remained what it had been. (By this he meant that there must be a hearing and a certification by the Board of the "appropriate unit" before the union would be recognized.) On three o'clock of that day the men went out.

■ On October 20, 1939, the union had cards from twenty-nine of the fifty employees. If the workmen were divided into those two units which the respondent later thought they should be, one group—"stampers, cutters, assemblers and binders"— would have contained thirty-two, of whom seventeen were in the union; the other group—"indexers, metal-workers, maintenance men and printers"—would have contained eighteen of whom twelve were in the union. It does not appear when two, named Krebs, joined the union; but it is apparent that in fact it had a majority of both groups. The respondent maintains, however, that it had no means of knowing that it had, or even that it had a majority taking the whole fifty employees as a single "unit"; and that it was therefore justified in insisting upon a "certification" by the Board under § 9(c), 29 U.S.C.A. § 159(c). That may well be an excuse when an employer is honestly in doubt and the union will not show its hand; but the Board found, as we have said, that the respondent had more than once conceded the issue. Moreover, there could have been no doubt after the meeting at the Regional Office of the Board, and yet the respondent still held out. These facts justified the Board in finding that it was refusing to bargain, quite aside from the declarations attributed to Hurwitz.

■ The respondent next argues that a new election is necessary before an order passes directing the company to recognize the union. Eighteen months and more have passed since the events as to which the evidence was taken, and it is of course possible that the union has lost its majority. We have three times made a new election the condition of an enforcement order. National Labor Relations Board v. National Licorice Co., 2 Cir., 104 F.2d 655; National Labor Relations Board v. American Manufacturing Co., 2 Cir., 106 F.2d 61; National Labor Relations Board v. Acme Air Appliance Co., 2 Cir., 117 F.2d 417. The first two of these were before the Supreme Court had decided International Association, etc. v. N. L. R. B., 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50, but the last was afterwards. In the first the union had been organized only two weeks before a strike which failed, and was succeeded by a company union; moreover, the interval between the events and our order was two years. In the second case it was conceded that a majority of the employees would swear if called, that they no longer wished the old union to represent them. In the third the union cards ran out in a year and the year had expired. In the case at bar substantially all the employees had joined the union and there was no competitor; and while it is true that the strike ended very shortly after it began, that does not mean that its failure dissolved the union. It seems to us that in such a setting International Association, etc. v. N. L. R. B., supra, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50 rules.

■ Finally, the respondent argues that the Board's order invaded its privi-

lege of "free speech" guaranteed by the First Amendment, by making it a wrong under § 8(1), 29 U.S.C.A. § 158(1), to present to Napoli the company's views about unions and unionism. National Labor Relations Board v. Ford Motor Co., 6 Cir., 114 F. 2d 905. No doubt an employer is as free as anyone else in general to broadcast any arguments he chooses against trades-unions; but it does not follow that he may do so to all audiences. The privilege of "free speech," like other privileges, is not absolute; it has its seasons; a democratic society has an acute interest in its protection and cannot indeed live without it; but it is an interest measured by its purpose. That purpose is to enable others to make an informed judgment as to what concerns them, and ends so far as the utterances do not contribute to the result. Language may serve to enlighten a hearer, though it also betrays the speaker's feelings and desires; but the light it sheds will be in some degree clouded, if the hearer is in his power. Arguments by an employer directed to his employees have such an ambivalent character; they are legitimate enough as such, and pro tanto the privilege of "free speech" protects them; but, so far as they also disclose his wishes, as they generally do, they have a force independent of persuasion. The Board is vested with power to measure these two factors against each other, a power whose exercise does not trench upon the First Amendment. Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used, of which the relation between the speaker and the hearer is perhaps the most important part. What to an outsider will be no more than the vigorous presentation of a conviction, to an employee may be the manifestation of a determination which it is not safe to thwart. The Board must decide how far the second aspect obliterates the first.

A majority of the court as now constituted regards that provision of the order which incorporates § 7 in its exact words as contrary to National Labor Relations Board v. Express Publishing Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. ——, but we yield to our recent decision in National Labor Relations Board v. Air Associates, Inc., 2 Cir., 121 F.2d 586.

An enforcement order may pass.