406 F.2d 1081
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
CONSOLIDATED CONSTRUCTORS AND BUILDERS, INC., and
United Brotherhood of Carpenters and Joiners of America, AFL-CIO, Local 621, Respondents.
 No. 7143.
 United States Court of Appeals First Circuit.
 February 14, 1969.
 
 Joseph A. Yablonski, Atty., with whom Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, and Glen M. Bendixsen, Attys., Washington, D. C., were on brief, for petitioner.
 Norman S. Reef, with whom Herbert H. Bennett, Portland, Me., was on brief, for respondents.
 Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.
 McENTEE, Circuit Judge.
 
 
 1
 This is a petition for enforcement of a Labor Board order. The order is based on findings that Respondents, Consolidated Constructors and Builders, Inc., (Consolidated) and Local 621[1] violated § 8(a) (3) and (1) and § 8(b) (2) and (1) (A) of the National Labor Relations Act in connection with the discharge of two of Consolidated's employees.
 
 
 2
 For many years prior to 1966 Consolidated, a Maine construction company, had a succession of labor contracts with Local 621, a Maine labor union. In addition to carpenters, these contracts specifically covered millwrights[2] and provided a millwright rate of twenty-five cents an hour higher than that listed for journeymen carpenters. On June 15, 1966,[3] the International, Local 621's parent union, chartered a new local known as Local 1219 with jurisdiction to represent all millwrights in the State of Maine.
 
 
 3
 At or about the time this new local was chartered, Local 621 and Consolidated were in the process of negotiating a new contract. Acting on instructions from International, Local 621 refused to bargain on behalf of the millwrights. On July 21, Consolidated filed refusal to bargain charges against Local 621 and the International. This dispute was resolved, but there is some confusion in the record as to precisely how and when. At any rate, on August 15 an agreement was reached at the bargaining table. The agreement was then reduced to writing and was executed on October 11, effective August 15. Since the old contract, due to expire on July 15, had been extended into August by oral agreement while the bargaining continued, at no time were the parties without a contract.
 
 
 4
 The new contract provided inter alia for a union shop and under it all new employees doing work over which Local 621 claimed jurisdiction were required to join that local seven days after their employment began. For present purposes, however, the most significant provisions of the new contract are contained in Article IV entitled "Trade Autonomy." Section 1A of this article provides as follows:
 
 
 5
 "Section 1A. The trade autonomy of the United Brotherhood of Carpenters and Joiners of America consists of milling, fashioning, joining, assembling, erecting, fastening, or dismantling of all material of wood, hollow metal or fiber, or of products composed in part of wood, hollow metal or fiber, and laying of all cork and compo, all shingles, the erecting and dismantling of machinery and the manufacturing of all wood materials, where the skill, knowledge and training of a carpenter are required, either through the operation of machine or hand tools." (Italics ours)
 
 
 6
 Section 1B provides, "[o]ur claim of jurisdiction * * * extends over the following divisions and subdivisions of the trade." After enumerating the various classifications covered, it states: "[p]rovided, however, that nothing herein shall be intended or interpreted as a claim by the Union of any of the trade autonomy or trade jurisdiction of Millrights." [sic]
 
 
 7
 In August, Consolidated hired two experienced millwrights named Clark and Sprague to work on the construction of a paper mill in Madawaska, Maine. Both had been members of Local 621 but when Local 1219 was chartered they withdrew from Local 621 and joined the new local. The great majority of the millwrights on the Madawaska job, however, were members of Local 621 and there was resentment that Clark and Sprague were not. The record indicates that although these two men were warned by representatives of Local 621 that they had to join Local 621 in order to work on the project they did not do so. Also, there was talk among the millwrights of a work stoppage if Consolidated allowed these two employees to continue to work without becoming members of Local 621. In the six weeks or so that Clark and Sprague were on the job this resentment grew until finally on September 21 Local 621's shop steward told Consolidated's job superintendent that there would be a work stoppage if Clark and Sprague continued on the job without joining Local 621. The next day the job superintendent asked these two employees if they had joined Local 621 and when they replied that they had not, he fired them.
 
 
 8
 The Board found that the contract between Consolidated and Local 621 in force at the time Clark and Sprague were fired was not intended to cover millwrights; hence these two employees could not lawfully be discharged under the contract's union shop provision. The Board further found that Consolidated discriminatorily discharged Clark and Sprague and that Local 621 by threatening a work stoppage, caused Consolidated to discriminate against them, thereby engaging in the unfair labor practices above mentioned. Accordingly, it entered the order here sought to be enforced.[4]
 
 
 9
 The first question presented for our determination is whether the Board erred in finding that millwrights Clark and Sprague were not intended to be within the contract unit. Consolidated argues[5] that since Clark and Sprague were discharged in the interim between August 15 when the agreement was reached and October 11 when it was executed, only the oral agreement was then in force and that parol evidence must be received to determine what actually transpired at the bargaining table. We find no merit in this contention. The very first line of the executed contract states: "Agreement Entered into and effective August 15, 1966 * * *." This was more than a month prior to the discharges in question. This procedure was in accordance with the past practice of the respondents.[6]
 
 
 10
 Consolidated next argues that the contract was ambiguous in that Section 1A of Article IV was intentionally worded by the parties to include work normally performed by millwrights even though Section 1B expressly excludes the class of workers known as millwrights. In our opinion the contract admits of no ambiguity. It is undisputed that the International, after chartering a new state-wide bargaining agent for millwrights, directed Local 621 not to negotiate for them. It was in this setting that the contract was agreed upon.
 
 
 11
 Section 1A sets forth the trade autonomy of the United Brotherhood of Carpenters and Joiners of America, which can only mean the International. Among the enumerated trades and activities are "the erecting and dismantling of machinery," which, as the chartering of Local 1219 bears witness, is an activity claimed by the International. But not all those activities were claimed by Local 621. Section 1B categorically sets forth "[o]ur claim of jurisdiction * * *." Read in context the word "our" can only stand for Local 621. That section explicitly renounces trade autonomy or jurisdiction over millwrights.[7]
 
 
 12
 Consolidated points to the fact that in its agreement with Local 621 settling the July refusal to bargain charges the latter agreed that it would negotiate on behalf of millwrights. We note that this agreement as reproduced in the record is dated January 4, 6, 1967, which is several months after the 1966 contract was executed and that there is nothing in the record to indicate that it was to be retroactive. This being so, we do not see its relevance. The record does indicate, however, that even after Local 1219 was chartered and at least until the date Clark and Sprague were discharged Local 621 continued to represent millwrights on the Madawaska project as it had in the past. Be that as it may, the fact remains that in its 1966 contract Local 621 expressly disclaimed jurisdiction over millwrights and the contract's union security provision applies only to employees within the bargaining unit. Under these circumstances we can only conclude that there was no union shop as to millwrights. In other words, after expressly contracting away its jurisdiction over millwrights in its 1966 agreement, Local 621 cannot now claim Clark and Sprague or any future millwrights who may choose to belong to Local 1219.
 
 
 13
 In our opinion the Board did not err in finding that the parties intended to exclude millwrights from the bargaining unit; and further, that there was substantial evidence that Clark and Sprague were unlawfully discharged.
 
 
 14
 Secondly, it is contended that the Board was not warranted in holding the respondents jointly and severally liable to Clark and Sprague for loss of pay suffered by reason of the above stated discrimination. This, too, is without merit in the circumstances of this case. The Board found that Consolidated and Local 621 had both done acts that resulted in the discrimination complained of. These findings are supported by substantial evidence. Local 621 brought pressure on Consolidated to discharge these two millwrights because they did not belong to Local 621 and Consolidated complied. Both violated the Act. It is well settled that the Board has wide discretion to fashion appropriate remedies and to make liability for back pay joint and several. N.L.R.B. v. Puerto Rico S.S. Ass'n, 211 F.2d 274, 276-277 (1st Cir. 1954). In view of the particular unfair labor practices sought to be redressed, we think the joint and several liability imposed here was appropriate.
 
 
 15
 The order of the Board will be enforced.
 
 
 
 Notes:
 
 
 [1]
 United Brotherhood of Carpenters and Joiners of America, AFL-CIO, Local 621
 
 
 [2]
 Generally speaking, carpenters work with wood whereas millwrights erect and dismantle machinery
 
 
 [3]
 All dates hereinafter mentioned refer to the year 1966 unless otherwise specified
 
 
 [4]
 Among other things, the order requires the respondents to cease and desist from causing or attempting to cause discrimination against millwrights because they refuse to become members of Local 621. It also requires them jointly and severally to make Clark and Sprague whole for any loss of pay resulting from the discrimination against them and to post the usual notices
 
 
 [5]
 Although respondent, Local 621, filed an answer to the amended petition for enforcement, it did not file a brief or argue in this court
 
 
 [6]
 
 XQ. (By Mr. Bennett, attorney for Consolidated) "And hasn't this always been our practice to reach an agreement at the bargaining table and then have one side draw up the agreement which might take a month or two?"
 A. (By Mr. Sargent, president of Local 621) "That is right."
 XQ. "And we have always abided by the terms of the agreement reached at the bargaining table?"
 A. "Yes, sir."
 It is noted that we are not here presented with the situation where parties by antedating a contract adversely affect the rights of third persons. See International Ass'n Machinists, Lodge 35 etc. v. N.L. R.B., 71 U.S.App.D.C. 175, 110 F.2d 29, 43-44 (1939), aff'd, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50 (1940).
 
 
 [7]
 Also we think it significant that for the first time in several years the contract made no mention of a millwright pay rate