CITY OF NEW HAVEN *v.* NEW HAVEN POLICE UNION
LOCAL 530 ET AL.
(13462)

CITY OF NEW HAVEN *v.* BOARD OF LABOR RELATIONS
ET AL.
(13463)

PETERS, C. J., SHEA, CALLAHAN, COVELLO and HULL, Js.

Argued January 10—decision released April 4, 1989

*Martin S. Echter,* deputy corporation counsel, for the appellant in both cases (plaintiff).

*Jackson T. King,* with whom, on the brief, was *Susan King Shaw,* for the appellees in both cases (defendant New Haven Police Local 530 et al.).

*Joseph M. Celentano,* assistant counsel, for the appellee in both cases (defendant state board of labor relations).

SHEA, J. Both of these appeals arise out of a dispute between the plaintiff city of New Haven and the defendant police union, concerning a decision of the city to cease the use of full-time policemen performing extra duty for the purpose of providing security at elderly housing sites operated by the city housing authority. In the first appeal, No. 13462, the city seeks review of a claimed interlocutory ruling by the Superior Court, *Hon. Joseph W. Bogdanski,* state trial referee, affirming a decision of the state board of labor relations (board) that the city, on February 25, 1981, had committed an unfair labor practice by failing to bargain collectively with the union before unilaterally using part-time policemen rather than full-time officers, who are represented by the union, as security personnel for elderly housing. In the second case, No. 13463, the city has appealed from a judgment of the Superior Court, *Fracasse, J.,* upholding the March 11, 1985 decision of the board concerning compliance with its orders that were the subject of the first appeal. With respect to the first appeal, we conclude that the city is barred from further review of the 1981 board decision and, therefore, dismiss that appeal. With respect to the second appeal, we find error in the trial court's conclusion that the 1985 board decision was a proper implementation of the 1981 decision and remand for further proceedings before the agency.

The findings of the board as set forth in its 1981 decision are not disputed. In August, 1979, the city began to use full-time policemen as extra duty officers to provide security at thirteen elderly housing sites operated by the New Haven Housing Authority, a separate municipal entity. This change from the preceding security arrangement at these locations occurred when $250,000 of a federal community development grant became available for that purpose. Only full-time officers were used to provide these services until June 30,

1980, when the city ceased that practice and began to use part-time policemen for that purpose. During the negotiations between the city and the union for the collective bargaining agreement executed on June 6, 1980, the amount of premium pay for extra duty assignments was one of the subjects discussed.

In May, 1980, after the city learned that the federal grant for the fiscal year beginning July 1, 1980, would be reduced, its board of aldermen decided that none of the community development funds should be used to provide security personnel for elderly housing. The board of aldermen voted, nevertheless, to appropriate $125,000 from other city funds to help pay for such personnel. This sum was about half the amount that had been paid for the services of full-time policemen at the elderly housing sites in the fiscal year ending June 30, 1980. In order to provide as many security people as possible with the limited money available, the city began to use part-time police officers, who were not members of the bargaining unit represented by the defendant union, for protection of the elderly housing sites. These officers were not entitled to receive premium pay for this service, unlike the full-time policemen who had been used for this purpose from August, 1979, to July, 1980. This change became effective on July 1, 1980, and from that date until September, 1983, none of the full-time policemen represented by the union were assigned to elderly housing as extra duty.

On July 7, 1980, the union filed a complaint with the board alleging that the city had engaged in an unfair labor practice by assigning to others the work that had previously been performed by members of the bargaining unit without first negotiating with the union. After a hearing the board concluded that the practice for the prior eleven months of using full-time police officers to provide security services for elderly housing had become a condition of the employment of full-time offi-

cers, and that the city had violated its duty to bargain in good faith concerning a change in such a condition prior to implementing it. The board, however, recognized that the decisions of the board of aldermen to allocate none of the federal funds received by the city to the protection of elderly housing and to limit the appropriation for this purpose to $125,000 from general city funds were "political and managerial," and that the city was entitled to make such decisions unilaterally without prior bargaining with the union. Nevertheless, it was held that, although the city could have limited the bargaining to the $125,000 that had been appropriated, it had breached its statutory duty to bargain collectively by failing to negotiate with the union before ceasing entirely to use bargaining unit members for this employment. See General Statutes §§ 7-469, 7-470 (a) (4) and (c). The board issued a cease and desist order and also specified several affirmative acts to be performed by the city ancillary to that order, including the obligation to compensate the policemen who had been deprived of the elderly housing extra duty assignments. Jurisdiction over the matter was retained by the board for the purpose of determining the amount of compensation due these officers in the event that the parties should fail to reach an agreement on that issue.

The city appealed the 1981 board decision to the Superior Court, which court, *Hon. Joseph W. Bogdanski,* state trial referee, on July 26, 1983, affirmed the conclusion reached by the board that the city had breached its statutory duty to bargain with the union before making the elderly housing assignments unavailable as extra duty for full-time policemen. No appeal was taken from this judgment.

The parties returned to the board for further proceedings relating to compliance with the portion of the 1981 decision ordering the city to compensate those policemen who had been deprived of the opportunity to per-

form extra duty work at the elderly housing sites "for the loss they suffered." On March 11, 1985, the board issued its "decision on compliance," which upheld the union's position on most of the disputed issues.

The city appealed the 1985 decision to the Superior Court on the ground that the board had ruled erroneously on issues involved in the calculation of the back pay to be awarded to those policemen claiming to have suffered losses because of the termination of elderly housing extra duty assignments after July 1, 1980. The court, *Mancini, J.,* on October 25, 1985, granted motions of the defendants to dismiss this appeal on the ground that the city should have raised the issues forming the basis for the appeal at the time it had appealed from the 1981 board decision and that the city was barred by the principle of res judicata from seeking further review of those issues after the court had affirmed the 1981 decision and no appeal from that judgment had been filed. The city appealed this judgment of dismissal to the Appellate Court, which set aside the judgment and remanded the case for further proceedings. *New Haven* v. *Board of Labor Relations,* 9 Conn. App. 546, 548, 520 A.2d 245 (1987). The Appellate Court held that "[t]he reservation by the board, in its initial decision, of the determination of the amounts due under that decision operated to exempt that aspect of this litigation from the doctrine of res judicata." Id., 547–48.

On remand, the trial court, *Fracasse, J.,* considered the appeal on its merits and on March 3, 1988, affirmed the 1985 board decision, concluding that the board had not exceeded its authority to fashion an appropriate remedy for the city's violation of its duty to bargain. The court specifically rejected the contentions of the city that the total compensation award should be limited to the $125,000 appropriation concerning which the duty to bargain had been found, that the records of prior employment at the elderly housing sites for the

individual officers claiming compensation should have been considered in determining the amounts they had lost, and that a deduction[1] should be made for the earnings of each claimant from other extra duty work performed after July 1, 1980, in calculating his loss from the unavailability of the elderly housing assignments. From this judgment the city appealed to the Appellate Court claiming that: (1) the 1981 board decision establishing its liability was erroneously affirmed by the trial court; and (2) the trial court erred in affirming the 1985 board decision on compliance because the board had failed to take into account several highly significant factors for determination of the appropriate compensation for each claimant. The appeal has been transferred to this court pursuant to General Statutes § 51-199 (c).

I

In seeking at this time review of the 1981 board decision, which not only found that the city had failed to perform its statutory duty to bargain but also ordered various relief, including a direction to compensate the officers affected, the city claims that the decision was interlocutory because of the provision retaining jurisdiction in the board to determine later the amounts of compensation due. The city relies upon several cases,

---

[1] In the trial court, as well as before the board, the city had contended that the 1988 decision, ordering that the amounts to be awarded to the claimant policemen "should be computed by taking the amount of pay they would have received for such assignment and subtracting therefrom the amount of any overtime or extra duty pay they did in fact receive during the period covered by their deprivation of the pay for elderly housing protection," required that the earnings of the claimants from extra duty work during the period July 1, 1980, to September, 1983, be deducted on an annual basis from the amounts of their claims. The board limited the deduction from such extra duty employment to instances where a policeman had been paid for extra duty work on a date that he claimed to be available for elderly housing work by virtue of signing the roster for such work on the same date. The city has not briefed any claim of error with respect to this determination.

not involving administrative appeals, in which we have held that a judgment resolving the issue of liability but leaving the issue of damages or other relief undecided is not a final judgment from which an appeal lies. *Stroiney* v. *Crescent Lake Tax District,* 197 Conn. 82, 84–85, 495 A.2d 1063 (1985); *Pinnix* v. *LaMorte,* 182 Conn. 342, 343, 438 A.2d 102 (1980); *Palmer* v. *Hartford National Bank & Trust Co.,* 157 Conn. 597, 253 A.2d 28 (1968). These authorities are readily distinguishable from the present case, however, because the 1981 board decision includes various forms of relief related to the violation of the duty to bargain, as well as a declaration of the manner in which the policemen affected by that breach of duty are to be compensated.

The considerations underlying the requirement of finality of an agency decision as a prerequisite to judicial review are akin to those involved in the ripeness doctrine as applied to administrative rulings. "[I]ts basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories* v. *Gardner,* 387 U.S. 136, 148–49, 87 S. Ct. 1507, 18 L. Ed. 2d 681 (1967). "The cases dealing with judicial review of administrative actions have interpreted the 'finality' element in a pragmatic way." Id., 149. "[T]he relevant considerations in determining finality are whether the process of administrative decisionmaking has reached a stage where judicial review will not disrupt the orderly process of adjudication and whether rights or obligations have been determined or legal consequences will flow from the agency action." *Port of Boston Marine Terminal Assn.* v. *Rederiaktiebolaget Transatlantic,* 400 U.S. 62, 71, 91 S. Ct. 203, 27 L. Ed. 2d 203 (1970).

The 1981 board decision satisfies these criteria for a final decision of an agency. No further administrative proceedings were contemplated except with respect to implementation of the compensation provision of the order, in the event that the parties were unable to reach agreement.[2] The cease and desist provision, directing that elderly housing security assignments be given to full-time officers, the requirement that notice of the decision and order be posted and the mandate that the board be notified within thirty days of the steps taken to comply with the order would have become effective immediately in the absence of an appeal. Implicitly the city, by appealing from the 1981 order, and the board, by not seeking to dismiss that appeal as premature, recognized that it would not "disrupt the orderly process of adjudication," that "rights or obligations [had] been determined" and that "legal consequences [would] flow from the agency action." Id., 71.

Furthermore, appeals from decisions of the board are governed by the Uniform Administrative Procedure Act, General Statutes §§ 4-166 through 4-189. General Statutes § 4-180 of the act requires that an agency "in all contested cases shall render a *final decision* within ninety days following the close of evidence or the due

[2] We recognize that in *Connecticut Bank & Trust Co.* v. *Commission on Human Rights & Opportunities,* 202 Conn. 150, 520 A.2d 186 (1987), this court held that an appeal from an agency order determining that an employer had discriminated against the complainant because of her gender and awarding her back pay was not final because the precise amount of the award was not established until a subsequent agency order was issued two months later. In that case, however, it appears that the agency did not intend its first decision to be final and further proceedings before the agency related to the amount of compensation to be awarded were expressly indicated by the terms of the order. These proceedings, which involved additional evidence, continued after the appeal had been taken and culminated in a revision of the original award. The appeal was plainly premature because it interfered with an ongoing proceeding before the agency for which the parties had been requested to submit additional evidence.

date for filing of briefs in such proceedings." (Emphasis added.) No claim has been made that this provision has not been satisfied in the present case. It is only when a person is "aggrieved by a *final decision* in a contested case" that he may appeal to the Superior Court. (Emphasis added.) General Statutes § 4-183 (a). Such an appeal must be brought "within forty-five days after mailing of the notice of the *final decision* of the agency or, if a rehearing is requested, within forty-five days after mailing of the notice thereon." (Emphasis added.) General Statutes § 4-183 (b).

We view our statutes as giving an agency discretion to limit in a practical way the scope of an administrative proceeding in a contested case, upon which a final decision must be rendered within the prescribed ninety day period, and, when appropriate, to reserve for further proceedings certain issues whose resolution may depend upon the outcome of those to be adjudicated initially. So long as the agency intends to render a final decision and the person taking the appeal is aggrieved by the decision rendered, the fact that other related issues are reserved for later adjudication does not necessarily detract from its finality. The reservation by the board of the issue of compensation of the individual officers, upon which no evidence had been presented at the hearing, therefore, did not render its decision interlocutory. Such a reservation was appropriate in this instance because the time required for adjudication of the numerous claims of the individual officers might well have delayed enforcement of the cease and desist order.

From our determination that the board decision was final and thus appealable, it follows that the judgment of the Superior Court in 1983 affirming that decision was also final and that the city could have appealed from that judgment. General Statutes § 4-184. Its failure to do so, or to exercise the option under Practice

Book § 4002 to reserve its appeal until all of the issues had been disposed of by filing a notice of such reservation, precludes it from now challenging the basis for the 1981 board decision. Accordingly, the appeal in No. 13462 is dismissed.

## II

The city claims that the 1985 board decision on compliance is erroneous because: (1) the total amount of compensation to be paid by the city should have been limited to $125,000, the amount of the appropriation for elderly housing security; and (2) the proposed award of compensation, based solely on whether a particular officer had signed up for extra duty on a date after July 1, 1980, when he knew such work was unavailable, was wholly unreasonable. We agree with the city that the 1985 decision is erroneous in these respects.

### A

In its 1981 decision the board concluded that, although the city was faced with the need to cut in half the amount spent for elderly housing security, its duty to bargain remained, but the city could have controlled its parameters. "It could in this case, for instance, have insisted that all bargaining be conducted within the $125,000 limit set by the appropriation." In a footnote referenced to this sentence, the board declared as follows: "The seeking of additional appropriation may be a permissive subject of bargaining but it is not mandatory under the circumstances of this case." The basis for this limitation on the scope of the city's duty to bargain was the board's conclusion that the decision of the board of aldermen to appropriate $125,000 for security at elderly housing sites was "political and managerial."

Although the 1981 decision in ordering relief does not expressly limit the city's liability to $125,000, the

order relating to compensation directed the city only to *"make whole* those officers who requested the work after July 1, 1980 . . . and who were denied the opportunity to perform such work *for the loss they suffered because of such denial."* (Emphasis added.) We construe this directive to "make whole" as intended to compensate the affected policemen for the loss they suffered from the breach of the city's duty to bargain, which the board in 1981 concluded was limited to the $125,000 appropriation for elderly housing security. Since the city had no duty to bargain except within the amount of that appropriation, it follows that the losses suffered from the breach of that duty must reasonably be limited to that amount. The contrary view is wholly illogical and inconsistent with the 1981 board decision that the measure of compensation to the policemen should be the loss they suffered from the breach of the city's duty to bargain over the manner in which the $125,000 appropriation should be expended.

We need not address the contention of the union that the authority of the board under General Statutes § 7-471 (4) (B), after finding an unfair labor practice has been committed, to "take such further affirmative action as well as effectuate the policies" of the statutes pertaining to collective bargaining, would have justified a compensation award exceeding the $125,000 limit of the city's duty to bargain, as found in the 1981 board decision. If the board at that time had intended to impose such an extraordinary remedy, we presume it would have said so expressly. We have construed the order to "make whole" the policemen who suffered losses from the city's breach of its obligation to bargain as intended to give them only the same compensation they would have received if the city had fulfilled its duty, which was limited to the amount of the appropriation. The 1985 board "decision on compliance," which found that "there has been no failure to com-

ply" with the cease and desist provision of the 1981 decision, did not purport to impose any additional remedy for the city's breach, but attempted merely to clarify the compensation part of the order. There is no reason for this court to give special deference to the board's 1985 interpretation of its 1981 decision, because the construction of an administrative determination finalized by a judgment of this court on appeal, as in this case, is uniquely a question of law for the court.

## B

The 1981 board order to compensate "those officers who requested the work after July 1, 1980," referred to an exhibit consisting of the rosters that policemen interested in performing the extra duty work of providing security for elderly housing had signed each day to request an assignment at one of the thirteen locations. The practice of signing up for such work continued after the city had terminated the use of full-time policemen on July 1, 1980, and it was widely known that such assignments were no longer available. From this date of termination until September, 1983, when the city resumed the use of full-time policemen at elderly housing sites, many policemen regularly signed the roster to demonstrate their availability for these extra duty assignments, which they knew were nonexistent, in order to support their claims, which in total exceed $200,000,[3] for losses suffered from the city's termination of this work opportunity then being pursued before the board. It appears that 82.5 percent of the claims based on these rosters were made by officers who had worked only 18 percent of the total days spent by full-time officers on elderly housing assignments when these had been available from August,

---

[3] The parties have stipulated that, if the calculation of the amounts to be awarded the claimants is made on the basis of the 1985 board decision, the total sum to be paid by the city would be $213,887.50.

1979, to July, 1980. A large percentage of the claims were those of policemen who were union officers and had seldom, if ever, performed elderly housing work while such extra duty assignments were being offered. For example, a former president of the union, who had worked only twice at elderly housing sites during the period when such work was available, claimed $4725 for 1982 and $5278 for 1983 by virtue of signing up for such extra duty, which he knew he could not be called upon to perform. The same officer earned $4791 from other extra duty assignments in 1982 and $6900 in 1983, approximately the same amounts he had earned from such assignments in 1979, 1980 and 1981. Three policemen, who had never taken elderly housing assignments when they were available, nevertheless, filed substantial claims, including one claim for $6091 by the officer in charge of the extra duty lists, for losses suffered after such work had ceased simply because they had signed the rosters for such work.

The board in rendering its "decision on compliance" with its original 1981 decision did not purport to ascertain whether the policemen who had filed claims for losses resulting from the city's failure to bargain had actually suffered any financial loss. The board made no findings as to whether any of the officers involved would have accepted elderly housing assignments if they had been available on the dates when the officers' names appeared on the elderly housing duty lists. No determination of the amount due any individual officer was made. Instead of making findings concerning the individual claims of the policemen, the board made rulings upon disputes that had arisen between the city and the union as to the manner in which these individual claims should be resolved, leaving to the parties, with the assistance of an agent of the board, the determination of the actual amount to be awarded each claimant. The board's "decision on compliance" was

an attempt to clarify[4] the part of the original decision ordering compensation for those officers who had sustained losses from the city's breach of its statutory obligation.

The city contended that the record of extra duty work at elderly housing sites performed by the claimant policemen during the period when such work had been available was relevant in determining the amount of the loss an officer had sustained. The board adopted the union position that such evidence was wholly irrelevant. Accordingly, the board ordered that the calculation of the amounts to be paid to the claimants should be based solely on the records that had been signed by these claimants while aware that the elderly housing security work was unavailable, except that deductions should be made where an officer actually worked elsewhere on a night that he had signed up for elderly housing duty or was unable to work because of sickness or suspension from his job on such date.

The board set forth two reasons to support its ruling that the record of extra duty work that had actually been performed by the claimants at the elderly housing sites was irrelevant to the determination of the amounts of their losses from the unavailability of such work during the period July, 1980, to September, 1983: (1) the 1981 board decision had not expressly indicated that the prior work history of each claimant was to be considered; and (2) "comparison of an officer's pre-July 1, 1980 history of signing up for extra duty work at the elderly housing units with his post-July 1, 1980 record of signing up would be of doubtful probative value of anything." We conclude that both these grounds for the board's ruling were erroneous.

[4] The members of the panel who participated in the 1981 board decision did not participate in the 1985 decision. The panel issuing the 1985 decision, therefore, had to rely solely upon the text of the 1981 decision in ascertaining what the board intended at that time.

The fact that the 1981 board decision does not mention the prior work history of the claimants as a factor to be considered in calculating the losses of those officers who had been deprived of elderly housing security jobs does not indicate that the board at that time viewed such evidence as irrelevant. It is wholly speculative to draw such an inference from the absence of some express reference to such prior work history. The 1981 decision ordered the city to "make whole those officers who requested the work after July 1, 1980 . . . and who were denied the opportunity to perform such work *for the loss they suffered because of such denial.*" This order cannot reasonably be construed as intended to preclude the consideration of any evidence relevant to the amount of the loss the claimants had sustained.

It is true that the 1981 order also contained a directive that the amount "should be computed by taking the amount of pay [the policemen] would have received for such assignment and subtracting therefrom the amount of any overtime or extra duty pay they did in fact receive during the period covered by their deprivation of the pay for elderly housing protection." This provision of the order, however, refers to the amount they *"would have received* for such assignment," which implicitly requires that a determination should be made whether each claimant would in fact have taken the elderly housing assignments for which he had signed. Furthermore, this computation provision does not indicate that the board in 1981 had any purpose in mind other than to "make whole" those who had been deprived of a work opportunity that they would have taken if it had been available. We find nothing in the 1981 decision that would bar the use of the records of elderly housing extra duty work performed before July 1, 1980, in deciding whether a particular claim-

ant would have been likely to accept such an assignment and thus had suffered a loss from its unavailability.

Evidence of prior work history at elderly housing sites is relevant to ascertaining the loss sustained by each claimant, although it is not necessarily conclusive. "[A]ny fact may be proved which logically tends to aid the trier in the determination of the issue." *Pitt* v. *Kent,* 149 Conn. 351, 357, 179 A.2d 626 (1962). Records of former earnings are commonly admitted into evidence to prove losses sustained from inability to work resulting from wrongful acts. See *Silverman* v. *Springfield Advertising Co.,* 120 Conn. 55, 59, 179 A. 98 (1935). This practice is so generally accepted that no further refutation is needed of the board's conclusion that the records of extra duty work at elderly housing sites performed by the claimants prior to July 1, 1980, "would be of doubtful probative value of anything." Furthermore, these records, as well as the records of earnings for other extra duty employment would be significant in assessing the credibility of each individual claim. The city ought not to be deprived of the use of these records in challenging the good faith of each claimant in the appropriate forum for resolution of the individual claims. The board ruling precluding the use of these records by whatever tribunal may ultimately decide the genuineness of each claim and the amount to be awarded, therefore, was erroneous.

The trial court, in affirming the 1985 board decision, relied largely upon the deference that is ordinarily given to the factual and discretionary decisions of administrative agencies. *Connecticut Hospital Assn.* v. *Commission on Hospitals & Health Care,* 200 Conn. 133, 140, 509 A.2d 1050 (1986). The issues in this appeal from the 1985 board decision, however, do not involve factual or discretionary determinations based upon the credibility of each claimant but present questions of law properly raised on judicial review of a decision of an

administrative board. No special deference, therefore, must be paid to the two rulings of the board, issued as parameters for determining the individual claims, which we find erroneous. "[I]t is for the courts, and not for administrative agencies, to expound and apply governing principles of law." Id.

In No. 13462 the appeal is dismissed; in No. 13463 there is error, the judgment is set aside and the case is remanded with direction to render judgment sustaining the appeal and remanding the case for further proceedings before the board in accordance with this opinion.

In this opinion CALLAHAN, COVELLO, and HULL, Js., concurred.

PETERS, C. J., dissenting in part. While I agree with part I of the court's opinion, I respectfully disagree with part II. I would find no error in the trial court's judgment upholding the propriety of the remedial order fashioned by the state board of labor relations.

The majority concludes, in part I, that the plaintiff can no longer challenge the validity of the underlying 1981 State Board of Labor Relations (board) decision that adjudicated the rights of the parties. In its 1981 decision, the board concluded that, in assigning part-time non-bargaining unit employees to perform work previously performed by bargaining unit employees, the plaintiff had engaged in and was engaged in a prohibited act in violation of General Statutes § 7-470 (a) (4) of the Municipal Employee Relations Act (MERA). To remedy this statutory violation of the plaintiff's duty to bargain, the 1981 decision ordered the plaintiff to "[t]ake . . . affirmative action which the Board finds will effectuate the purposes of the Act." Among the steps then mandated was an order, denominated II (b), requiring the plaintiff to "[m]ake whole those officers who requested the work after July 1, 1980 and who

were denied the opportunity to perform such work for the loss they suffered because of such denial. This should be computed by taking the amount of pay they would have received for such assignment and subtracting therefrom the amount of any overtime or extra duty pay they did in fact receive during the period covered by their deprivation of the pay for elderly housing protection." Like the validity of the determination of the existence of a statutory violation, the validity of this remedial order is now a given, because it was part of the final 1981 decision that the plaintiff could have appealed.

Once the validity of the underlying remedial order is established, the only issue that remains is whether the board exceeded its authority in its 1985 decision concerning the plaintiff's alleged noncompliance with part II (b) of the 1981 order. The majority concludes that the compliance order was erroneous in two respects, in failing to cap the plaintiff's liability at $125,000 and in determining the eligibility of individual union members too expansively. I do not know how I would have resolved these questions if I had been sitting as a member of the board, but that is not the governing standard. Taking account of the board's established expertise in labor relations, and its broad authority to fashion appropriate remedial orders pursuant to General Statutes § 7-471 (4) (B),[1] I would defer to its judgment in this case.

---

[1] General Statutes § 7-471 (4) (B) provides: "Whenever a question arises as to whether a practice prohibited by sections 7-467 to 7-477, inclusive, has been committed by a municipal employer or employee organization, the board shall consider that question in accordance with the following procedure . . . . (B) If, upon all the testimony, the board determines that a prohibited practice has been or is being committed, it shall state its findings of fact and shall issue and cause to be served on the party committing the prohibited practice an order requiring it or him to cease and desist from such prohibited practice, and shall take such further affirmative action as will effectuate the policies of sections 7-467 to 7-477, inclusive, including

The majority holds that the board's rulings involve matters of law, and not matters of fact that warrant the deference we usually afford to an administrative agency's determination. This court and the federal courts,[2] however, have consistently recognized the nearly unfettered power enjoyed by the labor board in constructing remedies designed to encourage compliance with the act. " 'Because the relation of remedy to policy is peculiarly a matter for administrative competence, courts must not enter the allowable area of the Board's discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy.' *Phelps Dodge Corporation* v. *National Labor Relations Board,* 313 U.S. 177, 194, 61 S. Ct. 845, 85 L. Ed. 1271 [1941]." *Connecticut State Labor Relations Board* v. *Connecticut Yankee Greyhound Racing, Inc.,* 175 Conn. 625, 640, 402 A.2d 777 (1978). Thus, the act empowers the board to fashion remedies aimed not necessarily or exclusively at compensation, but at deterring violations of the act. "The particular means by which the effects of unfair labor practices are to be expunged are matters 'for the Board not the courts to determine.' " *Virginia Electric & Power Co.* v. *National Labor Relations Board,* 319 U.S. 533, 539, 63 S. Ct. 1214, 87 L. Ed. 1568 (1943),

but not limited to: (i) Withdrawal of certification of an employee organization established or assisted by any action defined in said sections as a prohibited practice, (ii) reinstatement of an employee discriminated against in violation of said sections with or without back pay, or (iii) if either party is found to have refused to bargain collectively in good faith, ordering fact finding and directing the party found to have refused to bargain to pay the full costs of fact finding under section 7-473 resulting from the negotiations in which the refusal to bargain occurred."

[2] MERA is closely patterned after the National Labor Relations Act and, "[t]herefore, ' "the judicial interpretation frequently accorded the federal act is of great assistance and persuasive force in the interpretation of our own act." . . .' " *Stratford* v. *Local 134, IFPTE,* 201 Conn. 577, 589, 519 A.2d 1 (1986); *Winchester* v. *Connecticut State Board of Labor Relations,* 175 Conn. 349, 354, 402 A.2d 332 (1978).

quoting *International Assn. of Machinists* v. *National Labor Relations Board,* 311 U.S. 72, 82, 61 S. Ct. 83, 85 L. Ed. 50 (1940). The board's determination should stand "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Virginia Electric & Power Co.* v. *National Labor Relations Board,* supra, 540; *Fibreboard Paper Products Corporation* v. *National Labor Relations Board,* 379 U.S. 203, 216, 85 S. Ct. 398, 13 L. Ed. 2d 233 (1964); *National Labor Relations Board* v. *Seven-Up Bottling Co. of Miami, Inc.,* 344 U.S. 344, 346–47, 73 S. Ct. 287, 97 L. Ed. 377 (1953); *National Labor Relations Board* v. *Fugazy Continental Corporation,* 817 F.2d 979, 982 (2d Cir. 1987); *Connecticut State Labor Relations Board* v. *Connecticut Yankee Greyhound Racing, Inc.,* supra, 640.

The compliance order in this case can hardly be characterized as "a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the act." The plaintiff has advanced no argument that the board, in fashioning its remedy, sought to achieve ends other than the prevention of MERA violations. Neither did it raise, before the board, any question about the union members' good faith in signing up for extra duty, an issue I should think would require resolution as a matter of fact. General Statutes § 4-183 (g).

I am equally unpersuaded that, as a matter of law, the remedial authority that MERA confers upon the board contains an implicit limitation that such remedial orders must conform to private law notions of compensatory damages. The plaintiff could have limited its exposure by engaging in collective bargaining over the allocation of the $125,000 fund that it had set aside for security personnel for elderly housing. Having instead violated MERA by refusing to bargain collectively, the plaintiff became obligated to pay whatever the board

reasonably determined to be required to make whole the defendant union members for the losses actually suffered as a result of the plaintiff's statutory violation. That seems to me the only plausible construction of the board's statutory authority to fashion appropriate affirmative relief to implement the statutory mandate of § 7-471 (4) (B).

Finally, I can discern no basis for the majority's suggestion that the absence of a dollar ceiling in the board's 1981 remedial order necessarily demonstrates that the plaintiff's liability to make whole the members of the defendant union would not exceed $125,000. Without the facts and figures required to calculate the extent of the loss attributable to the plaintiff's statutory violation, the board could reasonably have thought it inappropriate to set such a ceiling ab initio. In fashioning the 1985 compliance order, the board repeatedly indicated that it viewed that order as entirely consistent with the clear intent of its 1981 remedial order.[3]

In my view, both the board's underlying remedial order and its subsequent compliance order were therefore well within the board's authority as a matter of law. The application of the remedial order to the particular circumstances of the employer-employee relationships in this case seems to me to involve only questions of fact. Whether the particular terms of the compliance order are enforceable therefore devolves into a determination that is subject only to the limited judicial review authorized by the substantial evidence rule contained in General Statutes § 4-183 (g). Under

[3] The evidentiary rulings of the board on questions of relevance seem to me to fall within the board's discretionary authority to construe the scope of its remedial order. If, however, the plaintiff had wanted to object to the 1981 order on the ground of overbreadth for failure to take the claimants' prior work history into account, it should have pursued that question at an earlier stage in these proceedings.

the substantial evidence rule, an administrative finding of what constitutes compliance warrants judicial affirmance if the record affords " 'a substantial basis of fact from which the fact in issue can be reasonably inferred. . . .' " *Lawrence* v. *Kozlowski,* 171 Conn. 705, 713, 372 A.2d 110 (1976), cert. denied, 431 U.S. 969, 97 S. Ct. 2930, 53 L. Ed. 2d 1066 (1977). As we have recently reiterated, such a standard of review allows less room for appellate review than does a standard looking to the "weight of the evidence" or to "clearly erroneous" factfinding. *Briggs* v. *State Employees Retirement Commission,* 210 Conn. 214, 217, 554 A.2d 292 (1989); *Huck* v. *Inland Wetlands & Watercourses Agency,* 203 Conn. 525, 539–41, 525 A.2d 940 (1987). Because the majority concludes that the board's decision is deficient as a matter of law, it does not explore whether the compliance order lacks substantial evidentiary support as a matter of fact. I would hold that the plaintiff has made no showing of such evidentiary insufficiency.

Accordingly, I respectfully dissent from part II of the opinion of the court.